**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| PFIZER INC, FOLDRX PHARMACEUTICALS, LLC, PF PRISM IMB B.V., WYETH LLC, and THE SCRIPPS RESEARCH INSTITUTE, <br><br> Plaintiffs, <br><br> v. <br><br> DEXCEL PHARMA TECHNOLOGIES LIMITED, et al. <br><br> Defendants. | C.A. No. 23-879-GBW-CJB <br><br> **CONSOLIDATED** <br><br> **REDACTED PUBLIC VERSION** |

**DEFENDANTS HIKMA PHARMACEUTICALS USA INC.'S AND CIPLA LIMITED'S OPENING BRIEF IN SUPPORT OF THEIR MOTION TO EXCLUDE CERTAIN INFRINGEMENT TESTIMONY OF ADAM MATZGER, PH.D**

## TABLE OF CONTENTS

I.        NATURE AND STAGE OF THE PROCEEDINGS ........................................... 1

II.       SUMMARY OF THE ARGUMENT .................................................... 1

III.      FACTUAL BACKGROUND ................................................................. 1

          A.    The Asserted Claims Require Experimentally Derived XRPD Patterns or Raman Spectra that Exhibit Certain Peaks ........................................... 1

          B.    Dr. Matzger's Experimentally Derived Raman Spectra Failed to Exhibit ██████████████ .................................................................................. 2

          C.    Dr. Matzger Uses Unvalidated Curve Fitting to Support his Infringement Opinion ............................................................................................ 4

          D.    Dr. Matzger Uses Unvalidated Raman Mapping to Support his Infringement Opinion for Hikma's and Cipla's Drug Product Exhibit Batches .............................................................................................. 7

IV.       ARGUMENT ................................................................................. 8

          A.    *Daubert* Standard and Federal Rule of Evidence 702 ........................... 8

          B.    Dr. Matzger's Infringement Opinions That Rely On Curve Fitting are Unreliable and Should Be Excluded .................................................. 9

                1.    Unvalidated Curve Fitting is Not a Reliable Method to Prove the Existence of Raman Peaks in Experimental Spectra ............................... 9

                2.    Unvalidated Curve Fitting is Not Accepted in the Scientific Community For Dr. Matzger's Purpose .................................................. 15

          C.    Dr. Matzger's Infringement Opinions That Rely on Unvalidated Raman Mapping Are Unreliable and Should Be Excluded ................................ 18

V.        CONCLUSION .............................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Braun v. Lorillard Inc.*,
    84 F.3d 230 (7th Cir. 1996) ................................................................ 18

*Coffey v. Dowley Mfg., Inc.*,
    187 F. Supp. 2d 958 (M.D. Tenn. 2002) ........................................... 14

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) .................................................................. *passim*

*Gen Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) .......................................................................... 8

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994) ................................................................ 9

*Schering Corp. v. Apotex Inc.*,
    2012 WL 2263292 (D.N.J. June 15, 2012) ...................................... 18

*Warner Chilcott Lab'ys Ireland Ltd. v. Impax Lab'ys, Inc.*,
    2012 WL 1551709 (D.N.J. Apr. 30, 2012) ...................................... 15

**Other Authorities**

Fed. R. Evid. 702 ...................................................................... 8, 9, 14, 20

# TABLE OF EXHIBITS

| Exhibit No. | Description |
| --- | --- |
| 1 | Declaration of Emer Simic |
| 2 | Declaration of Joshua Miller |
| 3 | Opening Report of Dr. Adam J. Matzger, Ph.D. (excerpt) directed at Hikma, served June 27, 2025 ("Hikma Opening Report") |
| 4 | Opening Report of Dr. Adam J. Matzger, Ph.D. (excerpt) directed at Cipla, served June 27, 2025 ("Cipla Opening Report") |
| 5 | Reply Report of Dr. Adam J. Matzger, Ph.D. (excerpt) directed at Hikma, served November 7, 2025 ("Hikma Reply Report") |
| 6 | Reply Report of Dr. Adam J. Matzger, Ph.D. (excerpt) directed at Cipla, served November 7, 2025 ("Cipla Reply Report") |
| 7 | U.S. Patent No. 9,770,441 |
| 8 | Rebuttal Report of Jonathan Steed, Ph.D. (excerpt) |
| 9 | Rebuttal Report of Neil Spingarn, Ph.D. (excerpt) |
| 10 | November 20, 2025 Deposition Transcript of Neil Spingarn, Ph.D. (excerpt) |
| 11 | December 5, 2025 Deposition Transcript of Jonathan Steed, Ph.D. (excerpt) |
| 12 | Michael Bradley, *Application Note 50733: Curve Fitting in Raman and IR Spectroscopy: Basic Theory of Line Shapes and Applications*, Thermo Fisher Scientific (2007) |
| 13 | December 17, 2025 Deposition Transcript of Adam Matzger, Ph.D. (excerpt) |
| 14 | Brigitte Wopenka et al., *The Tendon-to-Bone Transition of the Rotator Cuff: A Preliminary Raman Spectroscopic Study Documenting the Gradual Mineralization Across the Insertion in Rat Tissue Samples*, 62(12) APPLIED SPECTROSCOPY 1285 (2008) |

| 15 | John J. Freeman *et al.*, *Characterization of Natural Feldspars by Raman Spectroscopy for Future Planetary Exploration*, 46 CANADIAN MINEROLOGIST 1477 (2008) |
| 16 | David Tuschel, *Peak Shape and Closely Spaced Peak Convolution in Raman Spectra*, 36(9) Spectroscopy 2 (2021) |
| 17 | Ke Lin et al., *The Microscopic Structure of Liquid Methanol from Raman Spectroscopy*, 114 J. PHYS. CHEM. B. 3567 (2010) |
| 18 | Matzger Hikma Notebooks XIX and XXIII |
| 19 | Matzger Cipla Notebooks XX, XXI, and XXII |
| 20 | Dr. Jonathan Steed's curve fitting analyses of AMJ-XIX-1.1, AJM-XIX-1.5, and AJM-XIX-1.8 (HIKM-000259) |

## TABLE OF ABBREVIATIONS

| Abbreviation | Description | Exhibit No. (if applicable) |
|---|---|---|
| XRPD or PXRD | X-ray Powder Diffraction | |
| 13C NMR | $^{13}$carbon solid state nuclear magnetic resonance | |
| ANDA | Abbreviated New Drug Application | |
| Hikma's ANDA Product | The tafamidis (61 mg) product described in ANDA No. ▮▮▮▮▮ | |
| Cipla's ANDA Product | The tafamidis (61 mg) produced described in ANDA No. ▮▮▮▮▮ | |
| Defendants' ANDA Products | Hikma's ANDA Product and Cipla's ANDA Product | |
| '441 Patent | U.S. Patent No. 9,770,441 | |
| Asserted Claims | Claims 1, 4-8, 13, 15, and 16 of the '441 patent | |
| Hikma Op. | Hikma Opening Report of Adam J. Matzger, Ph.D. | 3 |
| Cipla Op. | Cipla Opening Report of Adam J. Matzger, Ph.D. | 4 |
| Hikma Rep. | Hikma Reply Report of Adam J. Matzger, Ph.D. | 5 |
| Cipla Rep. | Cipla Reply Report of Adam J. Matzger, Ph.D. | 6 |
| Matzger Tr. | December 17, 2025 Deposition Transcript of Adam Matzger, Ph.D. | 13 |
| Steed Tr. | December 5, 2025 Deposition Transcript of Jonathan Steed, Ph.D. | 11 |
| Spingarn Tr. | November 20,2025 Deposition Transcript of Neil Spingarn, Ph.D. | 10 |

## I. NATURE AND STAGE OF THE PROCEEDINGS

Trial in this matter is set to begin on April 27, 2026. D.I. 22 The Joint Pretrial Order is due on April 14, 2026. *Id.* The pretrial conference is scheduled for April 21, 2026 at 3:00 pm. *Id.* Defendants Hikma Pharmaceuticals USA Inc. ("Hikma") and Cipla Limited ("Cipla") hereby respectfully submit this Brief in Support of Their Motion to Exclude Certain Infringement Testimony of Adam Matzger, Ph.D.

## II. SUMMARY OF THE ARGUMENT

Dr. Matzger's opinions on two points fail to meet the fundamental requirements of reliability and relevance required under *Daubert* and, therefore, should be excluded. These points are: (1) his use of curve-fitting, a data manipulation technique that models theoretical Raman spectra and peaks based on subjective user input; and (2) Raman mapping, which he performed without validation using reference standards or basic scientific controls.

## III. FACTUAL BACKGROUND

Dr. Matzger submitted four reports in this case: one opening infringement report each against Hikma and Cipla (excerpted as Exhibits 3 and 4, respectively), and one reply report each against Hikma and Cipla (excerpted as Exhibits 5 and 6, respectively).

### A. The Asserted Claims Require Experimentally Derived XRPD Patterns or Raman Spectra that Exhibit Certain Peaks

The '441 patent describes certain crystalline polymorphic forms of tafamidis, including Forms 1, 2, 4 and 6. '441 patent, Abstract, 2:16-7:21. It uses XRPD patterns and Raman spectra to do so.  Claim 1, the only independent Asserted Claim, recites:

> A crystalline form of [tafamidis], wherein said crystalline form has an analytical parameter selected from the group consisting of … a powder X-ray diffraction pattern comprising a peak at a diffraction angle ($2\theta$) of $28.6\pm0.2$, and a Raman spectrum comprising a Raman shift peak (cm$^{-1}$) at $1292\pm2$.

Thus, to infringe Claim 1, a crystalline form of tafamidis must exhibit (1) an XRPD diffraction pattern comprising a peak at 28.6°±0.2 (2θ), or (2) a Raman spectrum comprising a Raman shift peak at 1292±2 cm$^{-1}$.

The '441 patent explains that XRPD peaks disclosed in the patent for a given crystalline form of tafamidis were chosen by automated peak-picking software from XRPD patterns generated using a specific method. '441 patent at 12:48-13:64. Similarly, peak positions in the Raman spectra obtained by use of the disclosed method were "picked" from the relevant spectra "at the peak maxima." *Id*. at 14:6-18.

Plaintiffs allege that Hikma's ANDA Product and Cipla's ANDA Product each infringe the XRPD and Raman analytical limitations of the Asserted Claims and rely on Dr. Matzger's opinions in support. This brief addresses Dr. Matzger's opinions pertaining to infringement of the Raman analytical limitations of the Asserted Claims only.

**B.    Dr. Matzger's Experimentally Derived Raman Spectra Failed to Exhibit ████████████**

Plaintiffs' expert Dr. Matzger conducted Raman microscopy[1] on samples from each of Hikma's and Cipla's tafamidis drug substance (API) Validation Batches and drug product Exhibit Batches. Hikma Op., ¶¶213; Cipla Op., ¶185, ¶198. Dr. Matzger analyzed the resulting experimental Raman data using automated peak-picking software in a program called WiRE, "which is commonly used to process and analyze raw Raman data." Hikma Op., ¶214; Cipla Op., ¶175. The WiRE program "automatically identified the Raman shift peaks in the individual spectra." Hikma Op., ¶214; Cipla Op., ¶175. Where Dr. Matzger believed he saw visual evidence of unpicked peaks, he adjusted the thresholding algorithm. Hikma Op., ¶214; Cipla Op., ¶175.

---

[1] Dr. Matzger did not follow the Raman spectroscopy method disclosed in the '441 patent. Steed Rep., ¶106.

However, even after adjustment for greater sensitivity, the WiRE program did not identify a peak at ▬▬▬ in experimentally-derived Raman spectra of (1) Hikma's or Cipla's API Validation Batches (Hikma Op. Fig. 4 (shown below), Hikma Op. Fig. 8, Hikma Op. Fig. 12, Cipla Op. Fig. 15, Cipla Op. Fig. 39), and (2) Hikma's or Cipla's drug product Exhibit Batches (Hikma Op. Fig. 17, Hikma Op. Fig. 21, Hikma Op. Fig. 28, Cipla Op. Fig. 44, Cipla Op. Fig. 47, Cipla Op. Fig. 20) as required by the Asserted Claims. Figure 4 from Dr. Matzger's Hikma Opening Report and Figure 15 from his Cipla Opening Report are exemplary and are shown in Exhibits 3 and 4, respectively.

**Figure 4 – ▬▬▬ (XIX-1.1) Raman Scan**



**FIGURE 15 – Cipla Drug Substance Batch** ███████ **(AJM XXI-1.1)**



### C.     Dr. Matzger Uses Unvalidated Curve Fitting to Support his Infringement Opinion

Failing to objectively identify a peak at ██████████ in his experimental data, Dr. Matzger simply assumes that this peak is present but is somehow obscured. Specifically, Dr. Matzger claims that in the spectra for the API Validation Batches "the Raman shift peak at or around ████████ ██████████████████████████." Hikma Op., ¶215, Cipla Op., ¶176. Dr. Matzger then resorted to a data manipulation technique called "curve fitting" which, according to him would, "properly position the peak at ████." *See* Hikma Op, ¶¶220, 227, 235. He also used this same procedure for two of Hikma's Exhibit Batches. Hikma Op., ¶¶ 254, 263; Cipla Op., ¶¶181,194.

Dr. Matzger explains that curve fitting generates a "theoretical spectrum" with "theoretical peak positions." Hikma Op., ¶216, Cipla Op., ¶177. To create this theoretical spectrum, Dr. Matzger: (1) truncated the spectral window of the Raman spectrum "*to include the peak of interest* and any adjacent peaks that could influence the peak of interest," (2)

removed the baseline using a second order polynomial, (3) selected *the number* of theoretical peaks and *potential* peak positions based on his visual inspection ("*I approximately marked what appeared to be the true position of overlapping peaks*"), and (4) subjected the resulting data to a computational refinement procedure using WiRE software, which moves and resizes each modelled peak and minimizes the difference between the theoretical and experimental spectra to create a theoretical spectrum with theoretical peak positions. Hikma Op., ¶215; Cipla Op., ¶176.

For example, the theoretical spectrum that resulted from Dr. Matzger's curve fitting for Hikma sample XIX-1.1 (███████████████████) is shown as Figure 1 in Exhibit 3. Hikma Op., ¶220, Fig. 1. This theoretical spectrum includes a theoretical peak ████████ ████████████, which was not identified in the experimental spectrum for this sample. *Id.*; *see also* Steed Rep., ¶110, Figure E. Similarly, the theoretical spectrum generated from Dr. Matzger's curve fitting for Cipla sample AJM XXI_1.1 (██████████████████) is shown as Figure 13 in Exhibit 4. Cipla Op. ¶¶181-182, Fig. 13. This theoretical spectrum includes a theoretical peak (███████████  ████████, which was not identified in the experimental spectrum for that sample. *Id.*; *see also* Spingarn Rep., ¶76, Fig. 9.

Dr. Matzger then asserts that to determine "the importance of fitting" he generated an alternative theoretical spectrum that assumes there is no peak around ████████ Hikma Op., ¶221; Cipla Op., ¶182. These alternative theoretical spectra are shown as Figure 2 in Exhibit 3 (Hikma) and as Figure 14 in Exhibit 4 (Cipla). Dr. Matzger concluded that the "fit for [his alternative] spectrum was worse, based on both a visual comparison of the experimental and theoretical spectra . . . and based on the obtained $\chi^2$ values" reported by the WiRE program. *See* Hikma Op., ¶221, Cipla Op., ¶182.

Dr. Matzger does not describe any "visual comparison" of his theoretical spectra. And as for the $\chi^2$ values, as shown in the table below, Dr. Matzger's curve fits that assumed █████ █████████████ ██ had slightly lower $\chi^2$ values compared to the curve fits █████ ████████████████ █. Hikma Op., ¶220-221, Cipla Op., ¶¶181-182.



Hikma Op., ¶221, Cipla Op., ¶¶181-182. Dr. Matzger adopts a similar curve fitting process and analysis for each Hikma API Validation Batch and for two of the three drug product Exhibit Batches. Hikma Op., ¶¶227-228 (██████████ (XIX-1.5)), 235-236 (██████████ (XIX-1.8)), ¶¶254-255 (█████████ (XXIII-2.6)), and ¶¶263-264 (█████████ (XXIII-3.2)). Dr. Matzger likewise adopts a similar analysis for Cipla's other API Validation Batch and a drug product Exhibit Batch. Cipla Op., ¶191-192 (Matzger ██████████████ (Cipla Op. Figure 37 and 38)), Cipla Op., ¶¶194-195, ¶¶205-208 (Matzger ████████████ (Cipla Op. Figure 42 and 43)).[2] In each instance, from his subjective "fit" determination, Dr. Matzger concludes that a Raman peak is indeed present ██████████ in his experimental Raman data. *Id.*[3]

---

[2] Dr. Matzger states that "[w]ith respect to [█████████████], a Raman shift peak at █████████████ was not immediately discernable" even after employing a curve fitting process." Cipla Op., ¶207.

[3] Dr. Matzger also employs curve fitting in support of his theory that both Hikma's and Cipla's API and ANDA Products exhibit a Raman peak at ████████████ when such a peak does not

As explained in detail below, curve fitting is not a reliable method to prove the existence of an actual peak in an experimental Raman spectrum but instead is used to theorize or model the cause of certain features in experimental data. In fact, Dr. Matzger himself repeatedly describes the spectra and their resulting peaks generated from curve-fitting as merely theoretical. *See* Hikma Op., ¶¶ 215, 216, 221, 228, 236, 255, 264; Hikma Rep., ¶¶ 108, 156, 169, 170, 175, 188; Cipla Op. ¶¶ 176, 177, 182, 195, Cipla Rep., ¶¶133, 189; *see also* Spingarn Tr., 202:3-14 ("[T]his a mathematical model. It is not three peaks. It is three bands that mathematically model the complex peak that's seen.") Such theories can only be validated by experimental evidence, which is absent here. Steed Tr., 259:15-261:3 ("accuracy in science is something which is validated by reference to external evidence, rather than intrinsic"); Spingarn Tr., 212:15-213:14 (" So now you can take a mathematical model and say, okay, knowing that there is a peak here and a peak there, let's pull it out. In the case of this -- in the case that we are dealing with though, we don't know for a fact that there is a peak at ███.")

### D. Dr. Matzger Uses Unvalidated Raman Mapping to Support his Infringement Opinion for Hikma's and Cipla's Drug Product Exhibit Batches

In addition to curve fitting, Dr. Matzger uses a technique called Raman mapping to claim that ████████████████████████████████████ ████. Raman mapping involves scanning a sample in an X-Y grid to yield thousands of individual spectra that each have a very short collection time, on the order of just a few seconds. Hikma Op., ¶245; Cipla Op., ¶185. Because of this short collection time, the resulting spectra are significantly noisier, which can impact the ability to observe weaker peaks. *Id.*

---

appear in his experimental data. *See, e.g.*, Hikma Op., ¶¶222-223, Cipla Op., ¶¶187-189, ¶¶202-203. This peak appears in claim 10, which is not asserted.

Although Dr. Matzger generated many thousands of individual spectra for each Exhibit Batch sample, he presents at most only ████████ from each sample. An example spectrum of such a map for a "particle"[4] from ██████████████████████ is shown as Figure 13 in Exhibit 3, and a map from Cipla's Exhibit Batch ██████ is shown as Figure 16 in Exhibit 4. *See also* Hikma Op., ¶246; Cipla Op., ¶185. In each case, Dr. Matzger claims that the map spectrum shows a "peak" at ████████████. However, Dr. Matzger presents no evidence that the "peaks" labeled by the software are actual peaks as opposed to noise. Steed Rep., ¶¶139-141; Spingarn Rep., ¶¶40, 72-75. ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████ Steed Rep., ¶140-142; Spingarn Rep., ¶¶40, 57, 72-75. Similarly, while the USP recommends performing validation of Raman instruments before performing any analysis to ensure the instrument is accurately identifying peak locations, Dr. Matzger provides no evidence that he did so. Cipla Rep., ¶166.

Dr. Matzger's failure to validate his Raman mapping data for Hikma's and Cipla's Exhibits Batches renders his infringement opinions that rely on such data unreliable as well.

## IV.    ARGUMENT

### A.    *Daubert* Standard and Federal Rule of Evidence 702

A trial judge is tasked with acting as gatekeeper to ensure that all scientific testimony is both relevant and reliable. *Daubert*, 509 U.S. 579, 589 (1993). Under *Daubert*, an expert's opinions must be excluded when there is "simply too great an analytical gap between the data and the opinion proffered" and the only link between the expert's opinion and the data is the "*ipse*

---

[4] Dr. Matzger never explains whether a "particle" is a ████████████████████████████████, or ████████████████.
[5] ████████████████████████████████████████████████████ ████████████████████████████████

*dixit* of the expert." *Gen Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997). The trial judge must assess whether the methodology underlying the proffered opinions is reliable and whether this methodology is applied reliably to the facts at issue. *See* Fed. R. Evid. 702.

In making assessments of reliability under *Daubert,* a court considers (1) whether the method can be or has been tested; (2) whether the method has been subjected to peer review or publication; (3) the rate of error of the method; and (4) whether the method has been generally accepted within the expert's respective community.[6] *See Daubert,* 509 U.S. at 593-94. If the court determines that the methodology underlying the proffered opinions or its application is unreliable, the expert's testimony is inadmissible and must be excluded. That is the case here.

### B.    Dr. Matzger's Infringement Opinions That Rely On Curve Fitting are Unreliable and Should Be Excluded

#### 1.    Unvalidated Curve Fitting is Not a Reliable Method to Prove the Existence of Raman Peaks in Experimental Spectra

Under *Daubert,* the Court must determine whether the premises on which Dr. Matzger's infringement opinions rely are testable or actually tested. Here, the answer is no. Dr. Matzger's reliance on curve fitting[7] as alleged proof of the presence of an actual Raman peak at ███████ ██ in the experimental spectra as required by the Asserted Claims lacks appropriate validation as required under *Daubert* and must be excluded as unreliable. *See Daubert,* 509 U.S. at 590.

---

[6] In addition to the factors articulated by the Supreme Court in *Daubert*, the Third Circuit identified the following additional factors which a court may consider in assessing reliability: "[(5)] the existence and maintenance of standards controlling the technique's operation; . . . (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 n.8 (3d Cir. 1994).

[7] Curve fitting is sometimes referred to as deconvolution.

1.     **Curve Fitting Produces Arbitrary Theoretical Spectra that are Based on Subjective User Input**

Curve fitting is a data manipulation technique that can be applied to postulate theoretical peak positions in a Raman spectrum in a region where no peaks have been detected by peak-picking software. Dr. Matzger admits that the peak positions and spectra resulting from his curve fitting are merely theoretical—he repeatedly uses that word to describe them. *See* Hikma Op., ¶¶215-216, 221, 228, 236, 255, 264; Hikma Rep., ¶¶108, 156, 169, 170, 175, 188; Cipla Op. ¶¶ 176, 177, 182, 195, Cipla Rep., ¶¶133, 189. These theoretical peak positions are generated by an algorithm based on suggestions as to their location by the operator. Hikma Rep., ¶¶108, 156; Cipla Rep., ¶185. They are also directly related to the curve fitting parameters that an operator subjectively selects. Steed Rep., ¶112, Spingarn Rep., ¶¶76-77, 84-85. Such curve fitting parameters include the way in which an operator smooths the data to reduce noise, corrects the baseline of the spectrum, selects the number of initial peak positions, selects the location of the initial peak positions, or otherwise utilizes spectral processing. *See* Michael Bradley, Thermo Fisher Scientific, App. Note: 50733 (2007) ("Bradley").[8]

Different curve fitting parameters can produce theoretical spectra with completely different theoretical peaks, as explained in detail below. Steed Tr., 277:7 ("[D]ifferent [curve] fits give different answers."). As stated above, in the curve fitting process, no peak can be fitted to the experimental data unless it has been manually added by the operator and different results (i.e., overall peak positions) can be obtained depending on what starting positions are used and how many peaks are added by the operator, how the background has been subtracted, and whether smoothing or other spectral processing has been used. Steed Rep., ¶112, Spingarn Rep., ¶¶76-77, 84-85. At best, an operator selects the curve fitting parameters based on external data

---

[8] Dr. Matzger cites to Bradley at ¶217, FN222 of the Hikma Opening Report.

(e.g., a reference standard). At worst, an operator selects the curve fitting parameters in an attempt to manipulate the curve fitting method into returning a desired result with no scientific basis, as Dr. Matzger has done in this case.

**2.      Dr. Matzger's Curve Fitting is Unreliable to Prove the Existence of an Infringing Raman Peak in the Experimental Data**

As noted above, Dr. Matzger admits that, even after increasing the peak-picking sensitivity, automated peak-picking software (and visual inspection) failed to detect an infringing peak at ▮▮▮▮▮▮▮ in the Raman spectra he obtained from analyzing samples of Hikma's and Cipla's API Validation Batches and drug product Exhibit Batches. Dr. Matzger then resorted to curve fitting to, in his words, "properly position the peak at ▮▮▮." Hikma Op., ¶220; Cipla Op., ¶¶181, 194. Dr. Matzger therefore assumed that a peak existed at ▮▮▮▮▮▮ in the experimental Raman data and incorporated that assumption into his curve fitting process.

As explained above, Dr. Matzger's curve fitted spectra are arbitrary theoretical models that are influenced by user choices; thus, without validation, such spectra cannot reliably identify the position of a peak where none has been identified in the experimental spectrum. To demonstrate this, Hikma's expert Dr. Jonathan Steed carried out an analogous curve fitting process using Dr. Matzger's experimental data for Raman spectrum XIX-1.1 but instead postulated that a peak exists at a point near ▮▮▮▮▮, as well as around ▮▮▮▮▮. ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ HIKM000259 (AJM-XIX-1.1); Steed Tr., 283:11-285:8*; see also* Steed Rep., ¶118 (alternative curve fit with XIX-1.1). Dr. Steed's alternative theoretical spectrum obtained using curve fitting exhibits a $\chi^2$ value of ▮▮▮▮▮ which is substantially lower than Dr. Matzger's $\chi^2$ value of ▮▮▮▮ for his theoretical spectrum. *Id.* According to Dr. Matzger, a ▮▮▮▮▮▮e, as obtained by Dr. Steed, indicates a

better "fit." However, unlike Dr. Matzger, Dr. Steed's model does produce a peak at ▇▇▇ ▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.



  Likewise, Dr. Steed's comparative curve fitting exhibited a visually better fit around Dr. Matzger's "region of interest" ▇▇▇▇▇▇▇▇. At his deposition, Dr. Matzger tried to walk away from his reliance on $\chi^2$ values, stating that "the more critical [analysis] is the visual fit, especially in the region of interest" when performing curve fitting. Matzger Tr., 284:13-285:22. However, the "visual fit" is not helpful to Dr. Matzger either. A magnified portion of Dr. Matzger's curve fitting for XIX-1.1 (▇▇▇▇▇▇ in the "region of interest" is included on the left below and a magnified portion of Dr. Steed's curve fitting for the same spectrum in the "region of interest" is included on the right below. *Compare* Hikma Op. ¶221, Fig. 1 with HIKM000259. The theoretical spectrum appears in dark green and the overlayed experimental data appears in red. In Dr. Steed's fit, the red and green lines ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.



Dr. Steed conducted a similar alternative curve fitting process (i.e., using the same method as Dr. Matzger except for the initial peak positons) for Hikma API validation Batch Nos. ███████████████████████ as well as ███████████████████████ ███████. Hikma Op., ¶¶227-228; 235-236; 254-255; 263-264. Each time, Dr. Steed obtained a lower $\chi^2$ value than Dr. Matzger and a visually excellent fit, but without a theoretical peak at ███████████. *See* HIKM_000259; *see* Steed Rep., ¶¶122-123; 148-150. This exercise illustrates that while both Dr. Steed and Dr. Matzger can achieve low $\chi^2$ values and visually good fits in the "area of interest" using curve fitting, the $\chi^2$ value and visual fit of a theoretical spectrum, without additional validation, are arbitrary and cannot reliably indicate the likelihood of any single theoretical peak actually being present in the experimental data. Steed Rep., ¶150.

Dr. Steed's improved alternative curve fits demonstrate that Dr. Matzger's curve fitting method and the theoretical spectra/peaks it generates depend on user choices and, thus, is arbitrary in nature. In other words, the problem is not that Dr. Matzger utilized curve fitting to model a hypothesis. The problem is that Dr. Matzger' opinions are based on a theoretical model, and he failed to conduct any confirmatory testing to determine whether his theory has any factual basis.

Cipla's expert Dr. Neil Spingarn also performed an alternative curve fitting process without subjecting the data to any baselining. The resulting theoretical spectra appears to have at least a comparable, if not better "visual fit" with the experimental spectra. Spingarn Rep.,

¶76. And Dr. Spingarn's resulting theoretical spectra *does not* show a peak around ███████[-1] but has a center around ██████ ████ ██████

### 3.    Dr. Matzger Does Not Validate his Curve Fitting Spectra

Since Dr. Matzger's "peaks" derived from curve fitting are merely theoretical, additional testing is required to validate (or at the very least provide any support for) the assumptions upon which the theoretical spectra are based and/or any conclusions drawn from the theoretical spectra. Dr. Matzger attempts neither. As a result, Dr. Matzger's infringement opinions that rely on curve fitting are unreliable under Federal Rule of Evidence Rule 702 and should be excluded.

Courts are wary of expert testimony based on theoretical modeling absent support for the assumptions underlying the model. *See Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 976 (M.D. Tenn. 2002), *aff'd*, 89 F. App'x 927 (6th Cir. 2003). The court in *Coffey* refused to admit an expert's testimony based on a computerized finite element analysis where the analysis was "the product of a number of 'guesstimations' and speculations." *Id.* The court found that if the parameters underlying the finite element analysis were incorrect, "[l]ike a house of cards, once those foundations are disproved, the whole analysis collapses." *Id.*

Similarly, here, Dr. Matzger proffers no test data or objective basis for the peak positions he initially selected to generate his curve fits ████████████████████████████ Instead, Dr. Matzger relies solely on his subjective "visual inspection" of what he calls "████ ████████████████████████" (Hikma Op., ¶215, Cipla Op., ¶176) or "██████████████" (Hikma Rep., ¶109; Cipla Rep., ¶135) that are seemingly visible only to Dr. Matzger himself and were not picked by peak-picking software (even under an increased sensitivity setting). Dr. Matzger's choice of peak position and number of peaks in generating his curve fits are therefore merely "guesstimations" that, if proven false, change Dr. Matzger's theoretical spectrum and contradict

14

his infringement opinions. *See* Steed Tr., 272:18-273:1 ("[d]ifferent models give rise to different answers."); Spingarn Tr., 202:4-20 ("suppose that you actually put in five or six in there. The computer would then model it and probably create a much better fitting overall spectrum. . .").

Aside from failing to validate any underlying assumptions of his curve fitting method, Dr. Matzger also fails to test his resulting theoretical spectra to determine if any such spectra are accurate. While there are various avenues Dr. Matzger could have pursued to determine whether his theoretical spectra hold water, Dr. Matzger does not do so. Instead, Dr. Matzger's opinions rest on his subjective analysis of $\chi^2$ values and visual inspection of only two theoretical models. Such "metrics" are no substitute for validation.

At bottom, Dr. Matzger's reliance on curve fitting models to prove the existence of infringing peaks in the experimental Raman data for Hikma's and Cipla's API Validation Batches and Exhibit Batches is based on "guesstimations" and unvalidated theories, not physical reality. As a result, his infringement opinions based on these models should be excluded under *Daubert*.

### 2. Unvalidated Curve Fitting is Not Accepted in the Scientific Community For Dr. Matzger's Purpose

*Daubert* also instructs Courts to ask whether a method is generally accepted in the scientific community for the expert's purpose. *See Daubert*, 509 U.S. at 591; *see Warner Chilcott Lab'ys Ireland Ltd. v. Impax Lab'ys, Inc.,* No. 2:08-CV-06304 WJM, 2012 WL 1551709, at *25 (D.N.J. Apr. 30, 2012), *aff'd sub nom. Warner Chilcott Co., LLC v. Impax Lab'ys, Inc.*, 478 F. App'x 672 (Fed. Cir. 2012). *Daubert* requires acceptance for the specific purpose at issue, not an adjacent or related purpose. While curve fitting can be a useful tool to model hypotheses, curve fitting is not generally accepted for determining the presence of an otherwise absent peak because "different models give rise to different answers" based on the same underlying data. Steed Tr., 272:18-273:1; *see also* 277:7; 282:11; 282:15-16; Spingarn Tr., 202:3-14; 259:15-261:3; 202:4-

20.

### 1.    Curve Fitting Posits, Not Proves, Peak Positions

While the use of automated peak-picking software is routine for a person of ordinary skill in the art to determine the presence of peaks in an unknown sample, curve fitting is not. *See* Steed Rep., ¶ 110; Steed Tr., 254:17-255:7 (referring to Wopenka et al., 62(12) Applied Spectroscopy, 1285 (2008), "[W]e're not talking about proving or not the existence of a peak"); Spingarn Tr., 200:21-202:10 ("[Curve fitting is] not like some magic mathematical process that figures out exactly what went into this complex band; it's a subjective process, where a person decides where they think things might be and how many things there might be. And then based on that, looks at how you can wiggle those initial guesses and come up with the best possible fit of those bands to the spectrum as best you can with a certain amount of wiggle room in heights and widths and intensities."). Unsurprisingly, Dr. Matzger fails to cite a single scholarly article that supports or even suggests curve fitting as a method to establish the existence of a peak in an experimental spectrum absent external evidence that such a peak exists.

Faced with an absence of experimental data that shows infringement, Dr. Matzger repurposes a technique that is used in the scientific community for a fundamentally different inquiry—the quantification of known peaks in a Raman spectra rather than the identification of unknown peaks. In fact, this is the way curve fitting is used in the references Dr. Matzger cites trying to justify his actions. *See* Steed Tr., 254:12-255:14 and 257:1-18, referring to Freeman et al., 46 The Canadian Minerologist, 1477 (2008) ("we're talking about known spectra of known materials, which are referred to by previous literature, which act as reference standards here."); Spingarn Tr., 205:5-208:2, (also discussing Freeman, "[I]seems like the three components that he is talking about all have individual spectra that have been separately identified and so now knowing exactly where things are in the individual spectra, he has a basis for [curve-fitting] and

knowing that it's – only certain specific peaks would be showing up."); Spingarn Tr., 208:3-211:16, referring to Wopenka ("this is a situation where you know that a specific peak is present at a specific location . . . it's a case where you know what the model is and you are using [curve-fitting] to back it out, which is a reasonable use of [curve-fitting].")

Not only do none of the references cited by Dr. Matzger support using curve fitting in the way he does here, but those references stress the need to *validate* the results of curve fitting instead of blindly adopting a theoretical spectrum. For example, two references warn that the results of curve fitting are largely dependent on the selected curve fitting parameters. *See* David Tuschel, 36(9) SPECTROSCOPY, 5 (2021) ("Those experienced with peak fitting software know that the results are not unique and can depend upon the initial settings of peak shape, position and bandwidth."); *see* Ke Lin et al., 114 J. PHYSICAL CHEMISTRY B. 3567, 3569 (2010) ("the interpretation depends critically on the microscopic model proposed.").

Additionally, Dr. Matzger's cited references also explain that curve fitting can result in theoretical peaks that do not exist in the experimental data but that provide a better $\chi^2$ value for the theoretical spectrum. *See* Bradley ("A large number of peaks may give a good visual residual but be totally meaningless to interpretation – some of the peaks may have no source in reality."); *see id.* ("fit routines can move peaks a substantial distance to a place in the spectrum where they make no physical sense, but where the convergence is slightly better."); Wopenka at 1289 ("our experience is that not all mathematically convergent solutions are spectroscopically meaningful."). Dr. Matzger himself admits that "it is possible to create a good fit for almost any spectrum simply by placing a very large number of peaks, which the software can then use to exactly match the experimental data, but such spectra are "totally meaningless to interpretation – some of the peaks may have no source in reality." Hikma Rep., ¶172. As noted above, each of Dr.

Matzger's "worse" fits had a lower number of peaks than the theoretical fits he relies on in support of his infringement opinions. And Dr. Matzger has not even attempted to show that the theoretical peaks he generates using curve fitting have a source in physical reality.

> ## 2. Outside the Litigation Context, Dr. Matzger Has Not Used Curve Fitting to Prove the Existence of Absent and Otherwise Unsupported Peaks

Dr. Matzger has not published any articles in which he applies curve fitting to prove the existence of an unknown peak in an experimental spectrum. As such, curve fitting for the purpose of identifying unknown peaks in Raman data does not appear to be a method Dr. Matzger employs "when [he is] doing [his] regular professional work," but instead functions merely as "an opinion helpful to one side in a lawsuit." *Braun v. Lorillard Inc.*, 84 F.3d 230, 235 (7th Cir. 1996). A court must be wary of such biased expert testimony. In *Schering Corp. v. Apotex Inc.,* No. 09-6373 PGS, 2012 WL 2263292, at *5 (D.N.J. June 15, 2012), *aff'd sub nom. Merck Sharp & Dohme Corp. v. Apotex Inc.*, 517 F. App'x 939 (Fed. Cir. 2013), the district court credited the testimony of an opposing expert that "Dr. Matzger overstepped the boundaries of a disciplined scientist" and found that Dr. Matzger's testing in that case did not prove infringement. He has done the exact same thing here. Dr. Matzger's reliance on a method that he neither employs in practice nor that has ever been subjected to scholarly scrutiny underscores that Dr. Matzger's infringement opinions based on curve fitting are neither reliable nor the product of sound scientific judgment.

> ## C. Dr. Matzger's Infringement Opinions That Rely on Unvalidated Raman Mapping Are Unreliable and Should Be Excluded

Dr. Matzger admits that he did not use any reference standards, ███████████ ████████████████████████████████ in connection with his Raman mapping analyses. Hikma Reply, ¶218; Cipla Reply ¶¶167-171. As a result, Dr. Matzger cannot say that the alleged

"peak" at ███████ is due to tafamidis API rather ██████████ (to the extent it is not merely noise) or any resulting degradants from Tafamidis API. Without such validation, his conclusions about infringement are unreliable. Steed Rep., ¶142 ("The way in which these Raman maps should be properly used is to have a validated low-noise reference standard (in this case, [the relevant forms] of tafamidis free acid and each ██████████ in Hikma's ANDA Product) and compare the whole spectrum from the map with the reference standards to identify the nature of the particle . . ."). While Dr. Matzger attempts to downplay this failure of evidence, he does not point to any references involving Raman mapping that did not involve validation using reference spectra.

Instead, with respect to the ████████, Dr. Matzger argues that the crystalline API "was readily distinguishable from the ██████████." Hikma Rep., ¶218. *See also* Cipla Rep., ¶212-215. ████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████ Matzger Notebook XIX at PFZ-00000107 (samples XIX-1.2, XIX-1.10); Matzger Notebook XXI at PFZ-00000099 (Samples AJM-XXI_1.1-1.4). However, Dr. Matzger did not discuss these mapping experiments in any of his expert reports.

With respect to his failure to generate reference maps of the relevant forms of tafamidis, Dr. Matzger states that had he done so, he "could have been accused of exposing his laboratory to contamination by those forms." Hikma Rep., ¶220, Cipla Rep., ¶168. ████████████████

for contamination belies this claim. Despite receiving the Hikma and Cipla samples at different times, he nevertheless conducted Raman testing on an improperly stored Cipla capsule on the same Raman instrument and on the same day as one of Hikma's samples. [9]

Dr. Matzger also failed to provide evidence of any validation he claims to have performed on the Raman instrument to confirm proper function before he analyzed the Hikma and Cipla samples. While Dr. Matzger asserts that he performed a single-point calibration "before each day's collection," (Cipla Op., ¶174) he provides no proof of or data reflecting these alleged calibrations; he did not "even know how to find it *if it's there*" and he did not "make an effort to save that data." Matzger Tr., 120:1-17. Similarly, while Dr. Matzger cites to a USP guidance stating that validation results must be included as part of the respective analytical test procedures, he simply chose not to do so. Matzger Tr., 136:15-137:8. Accordingly, Dr. Matzger's failure to validate his Raman mapping using reference standards or to demonstrate that he validated his instrument renders his resulting Raman maps unreliable as being non-compliant with established methods. His opinions regarding his Raman maps should therefore also be excluded.

## V.    CONCLUSION

For the foregoing reasons, this Court should exclude Dr. Matzger's proposed testimony that relies on curve fitting and/or Raman mapping under Rule 702 and *Daubert*.

---

[9] Dr. Matzger cut open one of Cipla's capsules on March 12, 2024, exposing the capsule fill to air, and improperly stored it ███████████████ until June 8, 2024, when he retested it on the same day he tested the first of Hikma's capsule samples. PFZ_00000095 at -96, -98; PFZ-00000101-103.

Date:  January 15, 2026

**SMITH, KATZENSTEIN & JENKINS, LLP**

*/s/ Daniel A. Taylor*
Neal C. Belgam (No. 2721)
Daniel A. Taylor (No. 6934)
1000 West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
nbelgam@skjlaw.com
dtaylor@skjlaw.com

*Of Counsel:*

Stuart D. Sender
Frank Rodriguez
Amlan Ray
Joshua I. Miller
**WINDELS MARX LANE & MITTENDORF, LLP**
One Giralda Farms
Madison, NJ 07940
Phone: (973) 966-3200
Facsimile: (973) 966-3250
ssender@windelsmarx.com
frodriguez@windelsmarx.com
aray@windelsmarx.com
jmiller@windelsmarx.com

*Attorneys for Defendant Cipla Limited*

**HEYMAN ENERIO GATTUSO & HIRZEL LLP**

*/s/ Dominick T. Gattuso*
Dominick T. Gattuso (# 3630)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
dgattuso@hegh.law
*Attorney for Defendant Hikma Pharmaceuticals USA Inc.*

*Of Counsel:*

Jeffrey S. Ward
Emer L. Simic
Charles K. Shih
Neal, Gerber & Eisenberg LLP
225 West Randolph Street, Suite 2800
Chicago, IL 60606
(312) 269-8000
jward@nge.com
esimic@nge.com
cshih@nge.com

*Attorneys for Defendant Hikma Pharmaceuticals USA Inc.*

21

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2026, a copy of the foregoing was caused to be served upon the following counsel by electronic mail:

Megan E. Dellinger (#5739)
**Morris, Nichols, Arsht & Tunnell LLP**
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
mdellinger@morrisnichols.com

Thomas H.L. Selby
Stanley E. Fisher
Seth R. Bowers
Andrew Hoffman
Rhochelle Krawetz
Ayelet Evrony
**Williams & Connolly LLP**
680 Maine Avenue SW
Washington, DC 20024
tselby@wc.com
sfisher@wc.com
sbowers@wc.com
ahoffman@wc.com
rkrawetz@wc.com
aevrony@wc.com
*Attorneys for Plaintiffs*

  /s/ Daniel A. Taylor

Daniel A. Taylor (No. 6934)