# EXHIBIT 4

# REDACTED PUBLIC VERSION

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| PFIZER INC., FOLDRX PHARMACEUTICALS, LLC, PF PRISM IMB B.V., WYETH LLC, and THE SCRIPPS RESEARCH INSTITUTE | ) ) ) ) ) | |
| Plaintiffs, | ) | Civil Action No. 23-879-GBW-CJB |
| | ) | |
| v. | ) ) | **CONFIDENTIAL** |
| | ) | |
| DEXCEL PHARMA TECHNOLOGIES LIMITED, et. al., | ) ) | |
| Defendants. | ) ) | |

## OPENING EXPERT REPORT OF ADAM MATZGER, PH.D.

## TABLE OF CONTENTS

I.      BACKGROUND AND QUALIFICATIONS ........................................................ 1

II.     ASSIGNMENT ............................................................................................ 3

III.    LEGAL INSTRUCTIONS ............................................................................. 4

    A.      Patent Claims .................................................................................... 5

    B.      Infringement ...................................................................................... 5

IV.     PERSON OF ORDINARY SKILL IN THE ART ("POSA") ................................ 8

V.      TECHNICAL BACKGROUND ..................................................................... 9

    A.      Crystalline Solids .............................................................................. 9

    B.      Polymorphism .................................................................................. 10

    C.      Characterizing Polymorphs ............................................................. 11

VI.     THE '441 PATENT .................................................................................... 16

    A.      Summary .......................................................................................... 16

    B.      The Claims of the '441 Patent ........................................................ 20

VIII.   SUMMARY OF OPINIONS ........................................................................ 26

IX.     INFRINGEMENT ANALYSIS ..................................................................... 28

    F.      My Analysis of Cipla's Tafamidis API and ANDA Product ............. 60

        1.      ████████████████████████████████████████

        2.      Raman Spectroscopy ......................................................... 71

    G.      ████████████████████████████████████████

        1.      Hygroscopic .................................................................... 87

2. Anhydrous ........................................................................................................ 88

H. ████████████████████████████████████████████████

I. ████████████████████████████████████████████████

X. CONCLUSION ...................................................................................................... 92

XI. APPENDIX ............................................................................................................. 93

## I.    BACKGROUND AND QUALIFICATIONS

1.    The following is a summary of my background and qualifications. My background and qualifications are more fully set out in my *curriculum vitae*, a copy of which is attached as Exhibit A to this report.

2.    I am the Charles G. Overberger Collegiate Professor of Chemistry in the College of Literature, Science and the Arts and a Professor of Macromolecular Science and Engineering in the College of Engineering, both at the University of Michigan, where I have held the title of Professor since 2009.  At the University of Michigan, I teach courses at the undergraduate level in the area of organic chemistry.  At the graduate level, I teach classes about spectroscopic characterization of organic molecules, polymer chemistry, and also a course on solid-state chemistry with a large component on structure and X-ray diffraction analysis, *e.g.*, X-ray powder diffraction.

3.    I am also President and CEO of ChemXLerate LLC—a company that provides analytical services primarily in the area of pharmaceutical solid forms.  My work with ChemXLerate encompasses polymorph, hydrate, and salt form production as well as characterization by techniques including X-ray powder diffraction, thermal analysis (*e.g.*, thermogravimetric analysis), and vibrational spectroscopy (*e.g.*, Raman spectroscopy).  I have analyzed hundreds of samples using these techniques.

4.    I obtained my B.A. in Chemistry from Oberlin College in 1992 and obtained my Ph.D. in Chemistry from the University of California at Berkeley in 1997.  My doctoral thesis encompasses synthetic, theoretical and structural studies on dehydrobenzoanulenes and phenylenes, and included extensive analytical work using different techniques such as X-ray

1

diffraction, vibrational spectroscopy, nuclear magnetic resonance spectroscopy, and electron microscopy.

5.      After obtaining my Ph.D. in 1997, I conducted postdoctoral research at the California Institute of Technology ("Caltech"), involving fundamental studies of crystallization with a strong emphasis on multicomponent crystallization. I was at Caltech until I joined the University of Michigan in 2000 as Assistant Professor of Chemistry and of Macromolecular Science and Engineering.

6.      I have published over 250 papers in peer reviewed journals. The vast majority of my publications relate to polymorphism, crystal structures, or solvates/cocrystals. My work has garnered over 30,000 citations from other researchers around the world.

7.      My current research interests focus on organic materials in the solid state ranging from crystalline polymorphs to porous materials. My work on crystal polymorphism relates to the ability of molecules to crystallize in more than one arrangement in the solid state, and includes issues relating to polymorphism, hydrates, solvates, amorphous states, and cocrystals.

8.      As part of my current research, and dating back to the start of graduate school, I have been involved in the synthesis of organic molecules, including using novel synthetic approaches to assemble complex products. This work has frequently involved using techniques that are used in attempting to form pharmaceutical salts, including purification and crystallization. Solid form characterization, in particular of pharmaceutical solids, is the longest running theme in my research program at the University of Michigan.

9.      I have received various awards and honors related to my work in solid-state chemistry, including the ACS Akron Section Award, Imes and Moore Faculty Award, being elected an American Association for the Advancement of Science Fellow, and the Alfred P. Sloan

Foundation Research Fellowship. I have served as an associate editor for the journal *Crystal Growth and Design* of the American Chemical Society, and as a member of the Editorial Advisory Board for the *Journal of Pharmaceutical Sciences*. I serve as a reviewer for journals and grant agencies evaluating characterization of materials in the area of solid-state chemistry. I have also been awarded numerous patents by the U.S. Patent and Trademark Office, including several directed to crystalline materials.

10. In the past four years, I have testified as an expert at trial or by deposition in the following cases: *In re Entresto (Sacubitril/Valsartan) Patent Litigation*, C.A. No. 20-2930-RGA (D. Del.); *Novartis Pharmaceuticals Corporation v. Alkem Laboratories Ltd. et al.*, C.A. No. 21-1330-RGA (D. Del.); *Novartis Pharmaceuticals Corporation v. Mylan Pharmaceuticals Inc. et al.*, C.A. No. 19-201-TSK (N.D. W. Va.); *In re Palbociclib Patent Litigation*, C.A. No. 19-2912-CFC (D. Del.); *Supernus Pharmaceuticals, Inc. v. Apotex Inc. et al.*, C.A. No. 20-7870-MAS-TJB (D.N.J.); *Mylan Pharmaceuticals Inc. v. Merck Sharp & Dohme Corp.*, IPR2020-00040 (P.T.A.B.)

11. I am being compensated at a rate of $1,000 per hour. My testimony is not contingent on the outcome of this case or the opinions I reach.

## II.    ASSIGNMENT

12. I understand that Cipla Limited ("Cipla) has filed an Abbreviated New Drug Application ("ANDA") No. ████ with the U.S. Food and Drug Administration to market and sell generic tafamidis 61 mg capsules ("Cipla's ANDA Product").

13. I have been retained by counsel for Plaintiffs Pfizer, Inc., FoldRx Pharmaceuticals, LLC, PF PRISM IMB B.V., Wyeth LLC, and The Scripps Research Institute in this case. I have been asked to provide expert opinions in this matter relating to the question of whether Cipla's proposed ANDA Product and administration of Cipla's proposed ANDA Product consistent with

the proposed label infringes Claims 1, ███████████ (the "Asserted Claims") of U.S. Patent

No. 9,770,441 (the "'441 patent").[1]

14.    In formulating the opinions contained in this report, I have considered my knowledge, training, basic texts and principles, and experience in the relevant scientific disciplines, as well as the materials cited or referenced in, or appended to, this report, including my own testing, and/or the materials listed in Exhibit B.

15.    My opinions in this report are based on the information provided or produced as of the date of this report.  I reserve the right to provide additional opinions in response to additional information produced by Cipla or third parties, including additional documents or testimony.

16.    In response to any assertions, arguments, or contentions made by any party or its experts in any submissions or during discovery, I expect to respond as appropriate or to provide additional evidence or testimony.

17.    If asked to testify, I may be required to explain the opinions and analyses described in this report.  I reserve the right to use demonstratives in support of my testimony, including to illustrate various concepts and principles addressed in the report.

## III.    LEGAL INSTRUCTIONS

18.    I have not been asked to offer an opinion on the law and will not do so.  However, as an expert assisting the Court in determining infringement, I understand that I am obliged to follow existing law.  I have been instructed by counsel to consider and apply the following law in analyzing whether Claims 1, ████████████ are infringed by Cipla.

---

[1] I understand that Plaintiffs have asserted that Cipla's ANDA product infringes claims 1, 4–8, 13, and 15–16 of the '441 patent.

19.     I understand that the patentee must show that it is more likely than not that the alleged infringer has infringed an asserted patent claim.  I understand that patent infringement is determined on a claim-by-claim basis.

**A.     Patent Claims**

20.     I understand that a patent may include two types of claims: independent claims and dependent claims. I have been informed that a dependent claim includes all of the limitations of the claim or claims from which it depends, as well as the additional limitation or limitations stated in the dependent claim itself.

**B.     Infringement**

21.     I have been informed by counsel that assessing infringement involves a two-step inquiry.

22.     First, the Court assigns the proper scope and meaning to the asserted patent claims. To determine this, the Court construes each proposed claim term to determine how the person of ordinary skill in the art at the time of invention (the "POSA") would understand the proposed term in the context of the patent's specification.  I discuss my understanding and opinions concerning the qualifications of the POSA below.  *See infra* § IV.  I understand that the parties did not ask the Court to construe any claim term in this case.  I therefore understand that the claim terms are given their plain and ordinary meaning as understood by the POSA in the context of the patent's claims and specification.

23.     Second, the properly construed claims are compared to the allegedly infringing product or method to determine if the product or its use embodies each limitation of the claims.

### 1.    Direct Infringement

24.    I understand from counsel that an allegedly infringing product may infringe a claim literally or equivalently.

25.    I understand from counsel that to determine whether an alleged infringer's product literally infringes an asserted claim, I must compare that product with the claim and determine whether every requirement (limitation) of the claim is included.  I understand from counsel that the claim cannot be literally infringed unless every limitation of the claim is met by the accused product or method.  I understand that I must determine literal infringement for each asserted claim separately.

26.    I understand that it is an act of infringement to file an Abbreviated New Drug Application with a certification of patent invalidity or non-infringement for the purpose of obtaining approval for commercialization of a drug claimed in a patent or the use of a drug which is claimed in a patent, before the relevant patent expires.  *See* 35 U.S.C.  271(e)(2).

### 2.    Indirect Infringement

27.    I have been informed by counsel that indirect infringement requires some party to have directly infringed the asserted patents.  I understand that a party is liable for indirect infringement if it actively induced, encouraged, or materially contributed to the infringing activity. I understand that indirect infringement occurs through induced or contributory infringement, described below.

### i.    Induced Infringement

28.    I understand that the accused infringer is liable for induced infringement if the accused infringer actively induced a third party to directly infringe the asserted patent claim literally or under the doctrine of equivalents, pursuant to 35 U.S.C. § 271(b).

29. As with direct infringement, I have been informed that induced infringement is determined on a claim-by-claim basis.

30. I further have been informed by counsel that the alleged infringer is liable for active inducement of a claim if the patentee proves by a preponderance of the evidence that (1) the induced acts carried out by a third party infringe the asserted claim, (2) the alleged infringer took action during the time the patent was in force that was intended to cause and led to the infringing acts by the third party, and (3) the alleged infringer was aware of the asserted patent and knew that the acts of the third party, if taken, would constitute infringement of the patent.

### ii.    **Contributory Infringement**

31. I have been informed by counsel that contributory infringement constitutes offering to sell or selling an item that is a material component of the patented invention, so that the buyer directly infringes the patent, pursuant to 35 U.S.C. § 271(c).

32. I understand that to be a contributory infringer, the alleged infringer must know that the part being offered or sold is designed specifically for infringing the patented invention and is not a component suitable for non-infringing uses.

33. I understand that to establish contributory infringement, the patentee must show that the alleged infringer (1) supplied an important component of the infringing part of the product; (2) the component is not a common component suitable for non-infringing use; and (3) the alleged infringer supplied the component with knowledge of the asserted patent and knowledge that the component was especially made or adapted for use in an infringing manner.

34. I have been informed that a "common component suitable for non-infringing use" is a component that has uses other than as a component of the patented product.

35.     I understand that, as with direct infringement, contributory infringement is determined on a claim-by-claim basis.

## IV.     PERSON OF ORDINARY SKILL IN THE ART ("POSA")

36.     I understand that the disclosures of the '441 patent should be viewed from the perspective of the POSA at the time of the claimed invention. I am informed by counsel that factors for determining ordinary skill in the art may include one or more of the following: (1) the educational level of the inventor; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; (5) the sophistication of the relevant technology; and (6) the educational level of workers active in the field.

37.     I have been asked to assume a priority date for the '441 patent of September 8, 2014.  Thus, all references to a person of ordinary skill in the art refer to a person of ordinary skill as of September 8, 2014.  I understand that Cipla has argued that Claims 1, ███████████ are not entitled to a priority date earlier than August 12, 2015.[2]  My infringement opinions would not change whether the priority date was September 8, 2014, or August 12, 2015.

38.     The art of the '441 patent includes organic chemistry, solid state chemistry, biochemistry, chemical engineering, and synthesis.  A person of ordinary skill in would have an advanced degree, such as an M.S. or Ph.D. or equivalent, in chemistry, chemical engineering or a related field, with at least two years of laboratory experience working with pharmaceutical solids, including polymorphic forms.  Alternatively, a person of ordinary skill would have a Bachelor's degree in chemistry or chemical engineering or a related field and at least five years of practical experience working with pharmaceutical solids, including polymorphic forms.

---

[2] Defendants' May 30, 2025 Final Invalidity Contentions for U.S. Patent No. 9,770,441, at 49–51.

39.     I have at least the qualifications and experience of the POSA and did as of the priority date.

40.     I reserve the right to alter or supplement my analysis and opinions in the event that Cipla or its expert(s) offer a different definition of the POSA.

## V.     TECHNICAL BACKGROUND

### A.     Crystalline Solids

41.     Crystals are solids comprised of atoms, ions, or molecules arranged in an ordered, repeating three-dimensional pattern.[3]  Solids that are not crystalline have no long-range order (meaning that their constituent molecules are not regularly oriented for more than a few molecules) and are therefore said to be amorphous.

42.     Crystals are often made up of molecules that interact with each other to form chemical bonds of different kinds.  The internal structure of a crystal is determined by the position of the atoms (or molecules) relative to each other and extending in three dimensions.

43.     Depicted below, for illustration purposes, is the crystal structure of acetaminophen, the main ingredient in Tylenol.[4]

---

[3] Harry G. Brittain, *Polymorphism: Pharmaceutical Aspects*, *in* ENCYCLOPEDIA OF PHARM. TECH. 2240 (2002).

[4] Tonglei Li *et al.*, *How specific interactions between acetaminophen and its additive 4-methylacetanilide affect growth morphology: elucidation using etching patterns*, 2(3) CRYSTAL GROWTH & DESIGN 185–89 (2002), at Fig. 1.



44.     The depicted crystal structure is just a small portion of the entire crystal.

## B.     Polymorphism

45.     A molecule can exist in different crystalline forms referred to as polymorphs.  Thus, while the crystal's chemical makeup is the same, the arrangement of molecules can vary.[5]  For example, aspirin can exist in multiple polymorphs.[6]  The ability of some compounds to crystallize into more than one distinct crystal structure is called polymorphism.  It is unpredictable whether a compound is capable of polymorphism, and if so, how many polymorphs exist.  Different crystalline forms of the same material can display significantly different properties.  This is illustrated by carbon, which can crystallize as graphite or as diamond.  Properties of these crystalline forms of carbon, such as their hardness, density, and electrical conductivity, are different.  These significant differences in properties resulting from differences in crystal structure

---

[5] Harry G. Brittain, *Polymorphism: Pharmaceutical Aspects*, *in* ENCYCLOPEDIA OF PHARM. TECH. 2239 (2002).

[6] Andrew D. Bond *et al.*, *On the Polymorphism of Aspirin,* 46(4) ANGEW. CHEM. INT'L ED. 615–17 (2007).

are not unique to carbon; they can occur in all materials that display polymorphism although the properties may be more subtly different.

46.     The molecules constituting an active pharmaceutical ingredient ("API") may have the ability to form more than one polymorph.  These polymorphs of the API may have differing properties, such as solubility, hygroscopicity, dissolution rate, and chemical and thermal stability.[7] These properties are important and can affect pharmaceutical use of the API, including the bioavailability, manufacturability, and the shelf life of the pharmaceutical product.

47.     A change from one polymorph to another is referred to as polymorphic conversion.[8] Conversion is often dictated by variables such as temperature, humidity, and solvents.[9]  As one example, at a specific temperature, one polymorph is more thermodynamically stable than other polymorphs.[10]  The less stable polymorphs, known as "metastable polymorphs" may convert into the stable polymorph when exposed to specific conditions, such as a specific temperature or solvent.

### C.     Characterizing Polymorphs

48.     Once different crystal forms are made, they can be characterized using a variety of techniques to determine their physical and chemical properties.

---

[7] Harry G. Brittain, *Polymorphism: Pharmaceutical Aspects*, *in* ENCYCLOPEDIA OF PHARM. TECH. 2239 (2002).

[8] *Id*. at 2240.

[9] *Id*. at 2240.

[10] *Id*. at 2240.

### 1.   X-ray Powder Diffraction

49.     One type of characterization technique is powder X-ray diffraction (also called X-ray powder diffraction, PXRD, XRD, XRPD, powder X-ray, *etc*., and hereinafter referred to as "XRPD").

50.     The XRPD process entails testing solid powder by exposing it to X-rays of a specific wavelength (typically between 0.5 and 2.5 Angstroms).   When X-rays of particular wavelengths are directed at a sample, they are diffracted.[11]   These diffraction angles are measured. Because the distances between the atoms in a crystal are of a length similar to the X-ray wavelength, the presence of a crystal structure in the sample will produce an observable pattern.[12]

51.     The relationship between the wavelength of the x-rays and the spacing between units in a crystal is known as Bragg's law:

$$n\lambda = 2d \sin \theta$$

where "n" is an integer (normally 1), "$\lambda$" is the wavelength of the incident x-rays, "d" is the interplanar spacing in the crystal (referred to as "d-spacings"), and "$\theta$" is the angle of incident X-rays on the crystal. [13]

52.     A device called a diffractometer measures the intensity of the diffracted X-rays at each of the angles of the incident X-rays, commonly referred to as Bragg angles, $2\theta$, "2-theta," or "two-theta" values.

---

[11] Harry G. Brittain, *Chapter 7: X-Ray Powder Diffractometry*, *in* PHYSICAL CHARACTERIZATION OF PHARMACEUTICAL SOLIDS 188–89 (1995).

[12] *Id*.

[13] *Id*.

53. The results of an XRPD analysis can be displayed as a diffractogram. A diffractogram, or pattern, from the '441 patent is shown below. As can be seen in this figure, the diffractogram is an x-y plot. The horizontal (x)-axis plots the 2θ value, which is measured in units of degrees. The vertical (y)-axis plots the intensity, which is measured in the unit "counts." Using Bragg's law, the 2θ values measured using one wavelength of X-rays may also be converted to the 2θ values that would be obtained for a different wavelength.



54. The X-ray diffraction pattern is, in effect, a fingerprint for a crystalline form. One or more peaks from a characterizing pattern can be used to identify a particular solid and

distinguish that form from among a number of known forms of a given compound.[14]  The different crystalline forms of a given compound almost always have different X-ray patterns, which allow these forms to be identified and distinguished from one another.

55.    In analyzing X-ray diffractogram data generated by the diffractometer, computer software routinely is used to determine which peaks are present in a given data set and their locations (*i.e.*, $2\theta$ values).  The software uses an algorithm to identify peaks and their locations and is particularly useful for differentiating between peaks and background noise.  Software settings can be adjusted based on the quality of the data and intensity of the peaks.

56.    Because a compound's different polymorphs produce different XRPD patterns, the location of peaks on the x-axis allows a person of ordinary skill in the art to identify a given form of a particular compound.

57.    Due to the variability in peak intensities, caused by preferred orientation and other factors, practitioners focus primarily on the peak position—rather than the peak intensity—in using XRPD to identify crystalline forms.[15]

58.    As of September 2014, a measurement error of $\pm0.2$ degrees for $2\theta$ values, or peaks, measured by XRPD was commonly assumed.  For example, the 2011 edition of the United States

---

[14] Anthony Severdia *et al.*, "Determination of Minor Quantities of Polymorph in Drug Substance: Comparison of Near-Infrared Spectroscopy and X-ray Powder Diffraction," 13(2) AMERICAN PHARMACEUTICAL REVIEW 68–73 (2010).

[15] *Characterization of Crystalline or Partially Crystalline Solids by X-Ray Powder Diffraction (XRPD), in* THE UNITED STATES PHARMACOPEIA  414 (2011) ("The agreement in the $2\theta$ diffraction angles between specimen and reference is within 0.2° for the same crystal form, while relative intensities between specimen and reference may vary considerably due to preferred orientation effects.").

Pharmacopeia ("USP"), which is the official pharmacopeia of the United States,[16] addresses the reproducibility of XRPD measurements. The USP states that "[t]he agreement in the 2θ-diffraction angles between specimen and reference is within 0.2° for the same crystal form, while relative intensities between specimen and reference may vary considerably due to preferred orientation effects."[17] The USP was understood by persons skilled in the art as permitting an error range of ±0.2° degrees for 2θ values.

59.     The smallest concentration of a material that can be qualitatively identified in a sample by a particular analytical method, including XRPD, is known as the limit of detection ("LOD").[18] Below the limit of detection of a particular analytical method, including XRPD, a form may still be present, but it will not be identifiable in the test results generated by that method.

## 2. Raman Spectroscopy

60.     Raman spectroscopy likewise is a routinely used analytical technique that provides detailed information about the chemical structure, polymorphism, and crystallinity of a material. The Raman effect arises from a change in the polarizability of molecular bonds during a given vibrational mode and is measured as scattered radiation.

---

[16] Prescription and over-the-counter medicines and other health care products sold in the United States are required to follow the standards in the United States Pharmacopeia–National Formulary. *see* USP, *What the Letters "USP" Mean on the Label of Your Medicine*, U.S. PHARMACOPEIA BLOG (Dec. 17, 2015), https://qualitymatters.usp.org/what-letters-usp-mean-label-your-medicine ("Today, drugs sold in the United States are required to meet USP standards regardless of whether they include the letters 'USP' on the label.").

[17] *Characterization of Crystalline or Partially Crystalline Solids by X-Ray Powder Diffraction (XRPD), in* THE UNITED STATES PHARMACOPEIA 414 (2011).

[18] *See* INTERNATIONAL COUNCIL FOR HARMONISATION OF TECHNICAL REQUIREMENTS FOR PHARMACEUTICALS FOR HUMAN USE, *Guideline for Industry—Text on Validation of Analytical Procedures, ICH-Q2A*, A-2 (Mar. 1995) ("The detection limit of an individual analytical procedure is the lowest amount of analyte in a sample which can be detected but not necessarily quantitated as an exact value.").

61.     Raman spectroscopy involves shining a high-intensity light source, such as a laser, on a material and measuring how the molecules of that material scatter light. A spectrometer collects the light and records the energy shift spectra, thus providing a unique Raman spectrum. A Raman spectrum thus features peaks that correspond to specific molecular bond vibrations. Raman spectroscopy is particularly well-suited for examining minute sample quantities in complex matrices due to the spatial resolution of Raman microscopy.

## VI.     THE '441 PATENT

### A.     Summary

62.     The '441 patent is titled "Crystalline Solid Forms of 6-Carboxy-2-(3,5-Dichlorophenyl)-Benzoxazole" and assigned to Pfizer Inc. The patent abstract states that "[t]he present invention relates to solid forms of 6-carboxy-2-(3,5-dichlorophenyl)-benzoxazole [(tafamidis)] and to methods for their preparation. The invention is also directed to pharmaceutical compositions containing at least one solid form and to the therapeutic or prophylactic use of such solid forms and compositions."[19]

63.     As the '441 patent explains, "[b]ased on a chemical structure, one cannot predict with any degree of certainty whether a compound will crystallize, under what conditions it will crystallize, how many crystalline solid forms of the compound might exist, or the solid-state structure of any of those forms."[20] The '441 patent describes "well-known techniques" for characterizing and classifying polymorphs, including "differential scanning calorimetry (DSC), X-ray powder diffractometry (PXRD), single crystal X-ray diffractometry, solid state nuclear

---

[19] '441 patent at Abstract.

[20] '441 patent at col. 9, ll. 34 – 38.

magnetic resonance (NMR), infrared (IR) spectroscopy, Raman spectroscopy, and hot-stage optical microscopy."[21]

64.    The '441 patent describes in detail at least four crystalline forms of tafamidis free acid—forms 1, 2, 4, and 6—in addition to an amorphous form.  The patent describes how "[t]hese forms may be used in a formulated product for the treatment of transthyretin amyloid diseases," and describes "process[es] for the preparation of each solid form."[22]  The '441 patent provides characteristic data for each of the described forms.[23]  For example, a characteristic XRPD pattern and peak list for Form 1 are provided in Figures 1 and 2 of the patent, reproduced below.



---

[21] '441 patent, col. 10, ll. 38–45.

[22] '441 patent, col. 10, ll. 52–67.

[23] *See* '441 patent at Figs. 1–21.

65.    A characteristic Raman spectrum and peak list for Form 1 are provided in Figures 5 and 6 of the patent, reproduced below.



66.    Based on the data reported in the patent, the XRPD peaks and Raman shift peaks recited in claims 1 ███████ are consistent with tafamidis free acid Form 1.   The claims are reproduced in full *infra* § VI.B.   More specifically, Form 1 is characterized by XRPD peaks and Raman shift peaks that are encompassed by claims 1 █████

67.    Additionally, the '441 patent describes Forms 1, 4, and 6 as "crystalline, non-hygroscopic, anhydrous" forms.[24]  The '441 patent examples "illustrate the preparation of the distinct forms of the invention," but expressly "are not intended to limit the scope of the invention" as defined or claimed in the patent.[25]

68.    The '441 patent acknowledges that "[o]ne of skill in the art will also recognize that crystalline forms of a given compound can exist in substantially pure forms of a single polymorph,

---

[24] '441 patent, col. 15, ll. 12–14; col. 16, ll. 11–13, 40–42.

[25] '441 patent, col. 21 ,l.52–col. 23, l. 4.

but can also exist in a crystalline form that comprises two or more different polymorphs or amorphous forms . . . .  One of skill in the art will recognize that many such combinations of several individual forms in varying amounts are possible."[26]

69.     The '441 patent describes compositions comprising the described crystalline forms and pharmaceutically acceptable excipients.  For example:

> Pharmaceutical compositions of the invention comprise a therapeutically effective amount of the active agent and one or more inert, pharmaceutically acceptable carriers, and optionally any other therapeutic ingredients, stabilizers, or the like. . . .  The compositions may further include diluents, buffers, binders, disintegrants, thickeners, lubricants, preservatives (including antioxidants), . . . surfactants (e.g., polysorbates such as "TWEEN 20™" and "TWEEN 80™", and Pluronic® F68 and F88, available from BASF), sorbitan esters, lipids (e.g., phospholipids such as lecithin and other phosphatidylcholines, phosphatidylethanolamines, fatty acids and fatty esters, steroids (e.g., cholesterol)), and chelating agents (e.g., EDTA, zinc and other such suitable cations).[27]

70.     The '441 patent also describes what may constitute "a therapeutically effective amount" of the described crystalline forms.  For example:

> A therapeutically effective amount will be an amount necessary to inhibit transthyretin (TTR) dissociation (i.e. prevents dissociation of the native TTR tetramer into monomers).
>
> . . .
>
> Those skilled in the art using conventional dosage-determination tests in view of the experimental data for an agent can ascertain optimal dosages for a given set of conditions.  For oral administration, an exemplary daily dose generally employed is from about 0.001 to about 1000 mg/kg of body weight, more preferably from about 0.001 to about 50 mg/kg body weight, with courses of treatment repeated at appropriate intervals.[28]

---

[26] '441 patent, col. 14, l. 58–col. 15, l. 10.

[27] '441 patent, col. 17, ll. 12–31.

[28] '441 patent, col. 17, ll. 43–50; col. 18, ll. 22–29.

B.     **The Claims of the '441 Patent**

71.     The claims of the '441 patent cover crystalline forms of tafamidis free acid having certain analytical characteristics.

72.     Specifically, claim 1 recites:

1.     A crystalline form of 6-carboxy-2-(3,5-dichlorophenyl)-benzoxazole, wherein said crystalline form has an analytical parameter selected from the group consisting of
    a solid state NMR spectrum comprising 13C chemical shifts (ppm) at 120.8±0.2 and 127.7±0.2,
    a powder X-ray diffraction pattern comprising a peak at a diffraction angle (2θ) of 28.6±0.2, and
    a Raman spectrum comprising a Raman shift peak (cm-1) at 1292±2.

73.     Claim 1 is written such that only one of the three listed sets of characteristics (solid state NMR shifts, a powder X-ray diffraction peak, and a Raman peak) need be present.





154.     ███████████████████████████████████████████████████

█████████████████████████████████

### F.  **My Analysis of Cipla's Tafamidis API and ANDA Product**

155.     In forming my opinions, I also tested Cipla's drug substance and drug product by XRPD and Raman spectroscopy using techniques well known to a POSA.

156.     I understand that Cipla sent samples of its API and drug product to counsel for Pfizer testing in February 2024.  Specifically, three drug product lots were shipped: ██████

████████████████████████████████████████████[137]

157.     I understand that these drug substance and drug product batches were also the batches identified in Cipla's ANDA, as noted below.[138]



158.     I understand that Cipla has represented there are no differences between the API and drug product that were given to Pfizer and the API and drug product that Cipla manufactured

---

[137] 

[138] Daroi Ex. 7 (CTAF 011498) at -498.

pursuant to its ANDA.[139]  I further understand that prior to production to Plaintiffs' counsel, the samples were stored per Cipla's defined storage conditions in a manner that Cipla contends would not affect their stability and shipped in controlled temperatures.[140]

159.    I understand that samples of Cipla's tafamidis API and drug product were shipped to me from Triclinic Labs, Inc. on March 26, 2024, and March 7, 2024, respectively.  I understand that while at Triclinic, the samples were stored per Cipla's defined storage conditions. *See* Report of Aeri Park, Ph.D.  Cipla's tafamidis API was shipped in a refrigerated container, and Cipla's drug product was kept below 25 °C during shipment. I stored the samples at the recommended conditions.

160.    My methods of analysis, as well as the results of my analyses, are described below and are in accordance with well-known and accepted techniques known to the POSA as of the priority date of the '441 patent.  In summary, my testing confirms that Cipla's proposed ANDA Product infringes claims 1, ██████.

161.    The following table aligns my own numbering system with the corresponding batches reported below:

| Matzger Notebook Number | Sample Number/ | Type | Testing |
|---|---|---|---|
| AJM-XX: 1.1-1.5, 4.1-4.4 | ████████ ) | Drug Product | Raman |
| AJM-XX: 2.1-2.2 | ████ ( ████ ) | Drug Product | Raman |
| AJM-XX 3.1-3.3 | ████ ( ████ ) | Drug Product | Raman |
| AJM-XXI 1.1-1.2 | 1467-8-1 ( ████ ) | API | Raman |
| AJM-XXI 1.3-1.4 | 1467-8-2 ( ████ ) | API | Raman |

[139] Daroi 4/18/25 Tr. 66:7–67:21, 71:3–21.

[140] Daroi 4/18/25 Tr. 67:22–68:18.

| AJM-XXII 1.1-1.2 | | ████ ██ | API | XRPD |
| AJM-XXII 1.3 -1.4 | | ████ ██ | API | XRPD |

### 1.    XRPD Scan

162.  ████████████████

█████  ████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████

█████  ████████████████████████████

█████████████████████████████████████

██████████████

█████  ████████████████████████████

█████████████████████████████████████

████████████████████████████████

█████  ████████████████████████████

█████████████████████████████████████

████████████████████

████████████████████████████

█████  ████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

## VI. *Remaining Drug Substance Batch* ███████

██  █████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

██  █████████████████████████████████████████████

████████████████████████████

### 2. Raman Spectroscopy

174.    I also analyzed the samples using Raman microscopy[141] in point focus mode on a Renishaw Qontor Microscope using a 785 nm laser and Renishaw Centrus 2957P5 detector. A 1200 line/mm grating was used and a slit opening of 50 μm to achieve a resolution of approximately 1 cm$^{-1}$. I calibrated the instrument using an internal silicon standard before each day's collection.

175.    I analyzed the Raman data using a software program called WiRE, which is commonly used to process and analyze raw Raman data. Using parameters generated by the default whole pattern thresholding algorithm for each spectrum, WiRE automatically identified the Raman shift peaks in the individual spectra. In cases where peaks were clearly visible, yet not picked, the thresholding algorithm was adjusted for greater sensitivity.

176.    Automatic peak picking using a simple peak picking algorithm can be less accurate where multiple peaks are overlapping. Overlapping peaks can cause the true peak position to

---

[141] Raman microscopy is a type of Raman spectroscopy that that relies on use of a microscope to increase spatial resolution and collect spectra from more regions of a sample. Raman microscopy is particularly well-suited for analyzing drug products, inasmuch as it allows for isolation of the Raman spectra for the API.

appear shifted, especially when the peak being identified is smaller than its neighbors.  In such

instances, a standard practice is to use fitting to accurately identify peak locations. [142] ██████

████████████████████████████████████████████████████████ ██████

██████████████████████    I took the following steps to fit the spectra:  First, I truncated the

spectral window to include the peak of interest and any adjacent peaks that could influence the

intensity of the peak of interest.  I then removed the baseline using a second-order polynomial

leaving the Raman shift peaks.  This baseline removal step is particularly important where the

background fluorescence signal is strong, as was the case when analyzing Cipla's drug product

samples.  I next indicated all potential peak positions based on a visual inspection, *i.e.*, I

approximately marked what appeared to be the true position of overlapping peaks.  The WiRE

program then ran a fitting procedure, which consists of moving and resizing each modelled peak

and minimizing the difference between the theoretical and experimental spectra.  From this

optimized fit, the peak center was reported.  I inspected the fit by comparing the theoretical and

experimental spectra and determined the fit was good for each experimental spectrum in the region

of the ██████ peak.

177.    This procedure is described in the Renishaw instrument manual, which notes that

"[c]urve-fitting calculates highly accurate values for . . . complex band systems where there may

---

[142] *See, e.g.*, Yuan and Mayanovic, *An Empirical Study on Raman Peak Fitting and Its Application to Raman Quantitative Research*, 71(10) APPLIED SPECTROSCOPY 2325 (2017) ("Fitting experimentally measured Raman bands with theoretical model profiles is the basic operation for numerical determination of Raman peak parameters."); David Tuschel, *Peak Shape and Closely Spaced Peak Convolution in Raman Spectra*, 36(9) SPECTROSCOPY 10 (2021), available at https://www.spectroscopyonline.com/view/peak-shape-and-closely-spaced-peak-convolution-in-raman-spectra ("Those who perform Raman spectroscopy know that acquiring a Raman spectrum is only the first step. What follows is often a detailed analysis of the individual peaks that make up the spectrum. The analysis step is usually performed using the spectral analysis and processing software provided by the vendor of the Raman instrument or a more general scientific data analysis software package.").

be two, three or more bands that overlap."[143]   The image below, taken from the Renishaw instrument manual, presents a visual example of picking theoretical peak positions and WiRE's generation of a theoretical spectrum that fits well the experimental spectrum.  The red spectrum and dark green composite curve represent the experimental and theoretical spectra, respectively. The other curves represent optimized positions and shapes for the marked peaks identified by the user after refinement.



178.    A white paper published by Thermo Fisher Scientific describes a similar fitting procedure, albeit for a different Raman analysis software, and demonstrates the value of fitting when dealing with overlapping Raman shift peaks.[144]

---

[143] RENISHAW MANUAL P.L.C., at 12.

[144] Michael Bradley, *Application Note 50733: Curve Fitting in Raman and IR Spectroscopy: Basic Theory of Line Shapes and Applications*, THERMO FISHER SCIENTIFIC (2007), https://assets.thermofisher.com/TFS-Assets/CAD/Application-Notes/AN50733_E.pdf.

179.    A proper comparison between the claims and my experimental data must apply the same level of precision for both data sets.  Here, the Raman claim limitations are recited to the nearest whole number.  Therefore, I rounded all experimental Raman data to the nearest whole number.

i.  **Analysis of Raman for Drug Substance Batch ██████ (AJM XXI-1.1-1.2).**

180.    It is my opinion that drug substance batch ██████ satisfies the limitations of claims 1 ████  Below, I provide diffractograms illustrating Raman shift peaks detected in drug substance batch ██████ that are within ±2 cm$^{-1}$ of the claimed Raman shift peaks.

I.  ***Claim 1: A crystalline form of 6-carboxy-2-(3,5-dichlorophenyl)-benzoxazole, wherein said crystalline form has an analytical parameter selected from the group consisting of . . . a Raman spectrum comprising a Raman shift peak (cm-1) at 1292±2.***

181.    ████████████████████ ████ ██

██████████████████████████

██████ ██████████████████

█████████████████



182. 

183.    The presence of other peaks recited in the Asserted Claims (set forth below) further supports my opinion that a claimed form is present in the sample.  The presence of all of these peaks also supports my opinion that the sample contains some Form 1 and satisfies the limitations of claim 1.

II.   ***Claim 8:*** ***The crystalline form of 6-carboxy-2-(3,5-dichlorophenyl)-benzoxazole of claim 1, wherein said crystalline form has a Raman spectrum further comprising Raman shift peaks (cm-1) at 994±2, 1273±2 and 1615±2.***

184.   ███████████████████████████████████████████████████

█████████   ███████████████████████████████████████████

█████████████████████   █████████████████████████████████

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

185.   Additionally, one common way to analyze a heterogeneous sample is to systematically scan over the sample in and X-Y grid and collect a spectrum at each point (this is sometimes referred to as a Raman map). This can yield thousands of spectra. To keep collection times reasonable when collecting so many spectra, it is typical to look at one fixed spectral region that is smaller than the whole Raman spectrum and to collect each spectrum for just a few seconds. The former point means that not all characteristic peaks will be found if they occur outside the window. The faster speed of collection limits achievable signal-to-noise, which can impact weak peaks. Consistent with my opinion above, I performed a Raman map of samples of Cipla's tafamidis API, and found spectra having all the peaks recited in claims 1 and 8. I have presented

this data below.  In essence, the algorithm fits each segment of the original spectrum within a specified window to a polynomial function.



### III.  _Other Peaks Recited in Claims 9 and 10_

186.    Consistent with my findings of the peaks recited in claims 1 ▮▮▮ there are additional Raman shift peaks recited in claims 9 and 10.  Although I am not offering an opinion that API batch satisfies the limitations of claims 9 and 10, the existence of those peaks further confirms the presence of Form 1, which supports my opinion that the drug product batch satisfies the limitations of claims 1 ▮▮▮

187.    ▮▮▮



188.    ▮▮▮

189. ███████████████████████████████████████

███████████  ██████████  ████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████



190. ████████████████████████████████████████

██████████████████████████████████████████████ █ █

██████████████████████  As seen in the '441 patent, the peak at ██████████ in Form 1

(which has all the Raman peaks recited in the claims) is a weak peak, especially as compared to

the other Raman peaks recited in the claims.[145] ██████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[145] '441 patent, Figs. 5 and 6

██████████████████████████. Depicted below are the relative positions and intensities of the Form 1 Raman peaks recited in the claims (with arrows added).



IV.    ***Remaining Drug Substance Batch*** ██████████

191.    I have included above data from analysis of one API batch— ██████████ However, the data from analysis of the other API batch ██████████ is substantially similar and is reported in Appendix § XI.B.i.

192.    Based on my testing and analysis, batches ██████████████████ infringe claims 1 and 8 of the '441 patent.

ii.  **Analysis of Raman for Drug Product Batch** ██████ **(AJM XX-3.1, 3.3)**

193.    It is my opinion that drug product batch ████ satisfies the limitations of claims 1 and 8.   Below, I provide diffractograms illustrating Raman shift peaks detected in drug product batch ████ that are within ±2 cm$^{-1}$ of the claimed Raman shift peaks.

**I.    _Claim 1_: A crystalline form of 6-carboxy-2-(3,5-dichlorophenyl)-benzoxazole, wherein said crystalline form has an analytical parameter selected from the group consisting of . . . a Raman spectrum comprising a Raman shift peak (cm-1) at 1292±2.**

194.   ███████████████████████████████████████

████████  ██████████████████████████████████████

██████████████████  ████████████████████████████

███████████████████████████████████████████████

██████████████████

███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

195.   ███████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████



196.    The presence of other peaks recited in the Asserted Claims (set forth below) further supports my opinion that a claimed form is present in the sample.  The presence of all of these peaks also supports my opinion that the sample contains some Form 1 and satisfies the limitations of claim 1.

> **II.    *<u>Claim 8</u>:  The crystalline form of 6-carboxy-2-(3,5-dichlorophenyl)-benzoxazole of claim 1, wherein said crystalline form has a Raman spectrum further comprising Raman shift peaks (cm-1) at 994±2, 1273±2 and 1615±2.***

197.    ███████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████████████████████████



198.    As explained in § IX.F.2.i.II, one common way to analyze a heterogeneous sample is to systematically scan over the sample.  Consistent with my opinion above, I found spectra having all the peaks recited in claims 1 and 8.  I have presented this data below.





### III.    _Other Peaks Recited in the Claims_

199.    Consistent with my findings of the peaks recited in claims 1 ███ there are additional Raman shift peaks characteristic of Form 1.





203. ██████████████████████████████████████████████

████████████████████████████████████████████████████ █

████████████████████████     As seen in the '441 patent, the peak at ███████████ in Form 1

(which has all the Raman peaks recited in the claims) is a weak peak, especially as compared to

the other Raman peaks recited in the claims.[146]  ██████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

204. ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

---

[146] '441 patent, Figs. 5 and 6

## IV.   *Remaining Drug Product Batches* ███████████████

205.   Similarly, I have included above data from analysis of one drug product batch—

████████. However, the data from analysis of the drug product batches ████████████████

are substantially similar and reported in Appendix §§ XI.B.ii–iii.

206.   Any differences between the drug product batches are explainable and do not affect

my analysis of infringement of claims 1 ████

207.   ████████████  ██████████████████████████  ████████████████

████████████████████████████████████████████████████████████████████

█████████████  ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████  ████████████████████████████████████

████████████████████████████████

208.   Based on my testing and analysis, batches █████████████████████████████

infringe claims 1 ████ of the '441 patent.

\*       \*       \*

209.   The following table summarizes the batches discussed in my report for which

XRPD and/or Raman testing confirms infringement of one or more claims.

| Representative Batches | Infringes One or More Claims? |
|---|---|
| ████████ (API) | ✓ |
| ████████ (API) | ✓ |
| ███████ (Drug Product) | ✓ |
| ███████ (Drug Product) | ✓ |



## X.    CONCLUSION

233.    For the reasons above, it is my opinion that Cipla's drug products infringe 1. █████████████ of the '441 patent.

Dated: June 27, 2025

Adam Matzger Ph.D.

---

160 ████████████████████████████

XI.     **APPENDIX**

  A.     **XRPD Scan**

    i.     





**B.      Raman Spectroscopy**

      i.      **Analysis of Raman for Drug Substance Batch ███████ (AJM XXI-1.3-1.4)**



**FIGURE 38 – Cipla Drug Substance Batch** ███████ **(AJM XXI-1.3)**



**FIGURE 39 – Cipla Drug Substance Batch ████████ (AJM XXI-1.3)**



**<u>FIGURE 40 – Cipla Drug Substance Batch</u>** █████████ **<u>(map) (AJM XXI-1.4)</u>**



**<u>FIGURE 41 – Cipla Drug Substance Batch</u>** ████████ **<u>(AJM XXI-1.3)</u>**

ii.    **Analysis of Raman for Drug Product Batch** ▮▮▮▮▮ **(AJM XX-2.1-2.2)**

**FIGURE 42 – Cipla Drug Product Batch** ▮▮▮▮▮ **(AJM XX-2.2)**



**FIGURE 43 – Cipla Drug Product Batch** ▮▮▮▮▮ **(AJM XX-2.2)**

**FIGURE 44 – Cipla Drug Product Batch _____ (AJM XX-2.2)**



**FIGURE 45 – Cipla Drug Product Batch ▮▮▮▮ (map) (AJM XX-2.1)**



**FIGURE 46 – Cipla Drug Product Batch ▮▮▮▮ (AJM XX-2.2)**



iii.    **Analysis of Raman for Drug Product Batch ▮▮▮▮ (AJM XX-4.2, 1.5)**

**FIGURE 47 – Cipla Drug Product Batch ▮▮▮▮ (AJM XX 4.2)**

**FIGURE 48 – Cipla Drug Product Batch ▮▮▮▮▮ (map) (AJM XX 1.5)**



**FIGURE 49 – Cipla Drug Product Batch ▮▮▮▮▮ (map) (AJM XX 1.5)**

