# EXHIBIT 9

# REDACTED PUBLIC VERSION

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| PFIZER INC.,<br>FOLDRX PHARMACEUTICALS, LLC,<br>PF PRISM IMB B.V., WYETH LLC, and<br>THE SCRIPPS RESEARCH INSTITUTE,<br><br>*Plaintiffs,*<br><br>v.<br><br>DEXCEL PHARMA TECHNOLOGIES LIMITED, CIPLA LIMITED, HIKMA PHARMACEUTICALS USA INC., AUROBINDO PHARMA LTD.,<br><br>*Defendants.* | C.A. No. 23-879-GBW-CJB<br>(Consolidated)<br><br>**CONFIDENTIAL –<br>SUBJECT TO PROTECTIVE ORDER** |

**REBUTTAL EXPERT REPORT OF
NEIL E. SPINGARN, PH.D.**

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ..................................................................................................1

II.     COMPENSATION ...............................................................................................2

III.    PRIOR TESTIMONY ..........................................................................................2

IV.     MATERIALS RELIED ON...................................................................................2

V.      BACKGROUND AND QUALIFICATIONS .......................................................3

VI.     SUMMARY OF THE OPINIONS .......................................................................5

VII.    APPLICABLE LEGAL PRINCIPLES.................................................................6

VIII.   BACKGROUND ..................................................................................................7

        A.      The '441 Patent                                                        7

        B.      Raman Spectroscopy                                                     8

        C.      Powder x-ray Diffraction versus Raman Spectroscopy                    9

IX.     DR. MATZGER'S RAMAN TESTING DOES NOT PROVE THAT CIPLA'S
        ANDA PRODUCT EXHIBITS THE CLAIMED RAMAN SHIFT PEAKS ..................11

        A.      The Instrumental Parameters Adopted by Dr. Matzger's for his
                Data Collection were Inadequate                                       12

                1.      Instrument Set Up                                             12

                2.      Lack of Proper Calibration of the Instrument, Validation and
                        Controls                                                      15

        B.      Dr. Matzger's Interpretation of The Data Was Flawed                   20

        C.      Underlying Data in Dr. Matzger's Report is Unreliable                 22

                1.      Presence of artifacts                                         22

                2.      Sample Decomposition                                          23

                3.      Misinterpretation of noise as peaks                           25

4.     Data Manipulation                           28

D.     Remaining Claims                            31

X.     CONCLUSIONS..................................................................................................40

## I.    <u>INTRODUCTION</u>

1.     I have been retained by Defendant Cipla Limited ("Cipla") as an expert consultant in the above-referenced litigation with Pfizer Inc.; FoldRx Pharmaceuticals, LLC; PF PRISM IMB B.V.; Wyeth LLC; and The Scripps Research Institute (collectively, "Pfizer" or "Plaintiffs").  If I am called at trial, I may testify with regard to the opinions and supporting rationale expressed in this report.

2.     I understand that this is a patent infringement litigation arising out of Cipla's filing of an Abbreviated New Drug Application ("ANDA") seeking Food and Drug Administration ("FDA") approval to market a generic version ("Cipla's ANDA product") of Plaintiffs' tafamidis product.

3.     I have been asked by Cipla's counsel to offer my opinions regarding the Opening Expert Report of Adam Matzger, Ph.D., dated June 27, 2025 ("Matzger Report"), regarding alleged infringement by Cipla's ANDA product.

4.     I have been informed that Plaintiffs have alleged that Cipla's ANDA product will infringe certain claims of United States Patent No. 9,770,441 ("the '441 patent").  Specifically, plaintiffs have alleged that Cipla's ANDA product will infringe claims 1, ██████████ ("the asserted claims") of the '441 patent.

5.     I have reviewed Dr. Matzger's Report as well as the data files and laboratory notebook produced in connection with his Raman spectroscopy analysis of sample of Cipla's tafamidis active pharmaceutical ingredient ("API") and Cipla's ANDA product.  Dr. Matzger

---

[1] Dr. Matzger mentioned in his report that he was not providing any opinion regarding infringement of claims ██████ by Cipla's tafamidis API and Cipla's ANDA product.  However, he still proceeded to analyze these claims that suggested that these claims are infringed.  Accordingly, I respond here to those allegations as well.

opined that Cipla's tafamidis API and the ANDA product infringes claims 1 and 8 of the '441 patent because they purportedly feature the claimed Raman shift peaks.

6.    I am aware that Dr. Matzger also discussed his analysis of results obtained on Cipla's tafamidis API using powder x-ray diffraction ("PXRD," also called XRPD).  I understand that Cipla has separately retained Prof. Leonard R. MacGillivray, Ph.D., to offer testimony regarding those PXRD tests performed by Dr. Matzger.

7.    For the reasons explained below, I do not agree that Dr. Matzger's work proves that Cipla's tafamidis API and Cipla's ANDA product infringe claims of the '441 patent based on Raman shift peaks at the claimed positions.  I also conclude that Dr. Matzger's methodology and interpretation of the Raman data were flawed.

## II.    COMPENSATION

8.    I am being compensated for my work in this case at my usual consulting rate of $750 per hour.  My compensation does not depend on the outcome of this case.

## III.    PRIOR TESTIMONY

9.    In the past four years, I have testified as an expert at a deposition or trial in several matters.  A listing of these matters is provided as Exhibit A.

## IV.    MATERIALS RELIED ON

10.    In preparing this expert report, I have relied on the materials listed in my materials considered list, attached here as Exhibit B, and any other materials cited herein.

11.    My opinions are based upon information currently known to me.  I reserve the right to supplement or amend my opinions in the event I become aware of any additional information or opinions after submission of this report.  If called to testify at trial, I may use demonstrative exhibits

to illustrate and support the facts about which I would testify. At this time, I have not prepared any such exhibits, but reserve the right to do so in accordance with the Court's orders.

## V.    BACKGROUND AND QUALIFICATIONS

12.    I am the President and Founder of S&N Labs, which has been serving as an analytical and consulting resource for over 40 years. I received a B.A. degree in Biochemistry from University of California (Berkeley) in 1974, M.S. and M. Phil. degrees in Pharmacology from Yale University in 1976, and a Ph.D. degree in Pharmacology, also from Yale University, in 1978.

13.    Upon completing my post-doctoral training in chemistry and pharmacology at the American Health Foundation, I held various teaching, research and managerial positions in academia as well as in the analytical services industry. From 1977 to 1980, I had various appointments to continue my training in chemistry, including as Lecturer in Chemistry at University of New Haven (New Haven, Connecticut), as Visiting Scientist at the National Cancer Center Research Institute in Tokyo, Japan, and as Postdoctoral Research Fellow at the American Health Foundation, Valhalla, New York.

14.    Between 1980-1981 I was an Assistant Professor in Pharmacology at University of California (Los Angeles). From 1980 to 1984, I was the Commercial Director of IT Analytical Services located in Cerritos, California. From 1985 to 1988, I taught at University of California (Irvine) in the Hazardous Material Management Program.

15.    In 1984, I opened an independent analytical services company – S & N Laboratories (Santa Ana) – which provides state-of-the-art consulting and microanalytical services to the legal, academic and industrial communities. S & N Labs specializes in trace and microscopic analysis of a variety of materials, including drugs, foods and medical devices.

16.     We commonly employ FT-IR, Raman, mass spectroscopy, electron microscopy and all forms of chromatography, among many other analytical techniques.  S & N Labs has always been an early adopter of new analytical technologies.  For example, it was the first laboratory to offer FT-IR microscopy in the world.

17.     I am currently a member of the American Chemical Society, the Society for Applied Spectroscopy, and the American Society for Materials.

18.     In my work, I have personally carried out thousands of Raman spectroscopy analyses with an emphasis on drugs and medical devices.  I have provided consulting and analytical services to numerous drug companies on issues of polymorphism and designed testing protocols to identify bulk and trace levels of polymorphs using such techniques as FT-IR, Raman and XRD.  In addition, I have developed methods in numerous fields to solve problems using Raman spectroscopy, including Raman analysis of pharmaceuticals.

19.     Additional details regarding my background, education and experience are summarized in my *curriculum vitae* which is attached hereto as Exhibit C.

20.     Counsel has informed me of certain legal principles to guide me in my analysis. Counsel has informed me that Plaintiffs carry the burden of proving infringement by a preponderance of the evidence, and that this means Plaintiffs must show that infringement is more likely than not.  To prove infringement, each claim limitation must be found in the accused product either literally or under the doctrine of equivalents.  I further understand that a dependent claim contains all of the limitations of the independent claim on which it depends and thus if the original independent claim is not infringed, the dependent claim cannot be infringed.  Based on my review of Matzger Report, I understand that in this case, we are only considering literal infringement.

## VI.    SUMMARY OF THE OPINIONS

21.    Dr. Matzger opines that Raman peak limitations of claims 1 ██ of the '441 patent are met by Cipla's tafamidis API and Cipla's ANDA product.  Dr. Matzger did not offer an opinion whether Cipla's tafamidis API and Cipla's ANDA product meet the Raman peak limitations of claims ██.  *See* Matzger Report at ¶¶ 186 and 204.  Nonetheless, Dr. Matzger alleged that he observed one of the Raman shift peaks of ████████ ██ ████████ ████ ██ in both Cipla's tafamidis API and Cipla's ANDA product.  *See* Matzger Report at ¶¶ 188, 189, 201, and 202.  While Dr. Matzger acknowledged that he could not find the Raman shift at ██ ██ ████, in either Cipla's tafamidis API and Cipla's ANDA product, he attributed the absence of the peak to being below the detection limit.  *See* Matzger Report at ¶¶ 190 and 203.  As I have explained below, I do not agree with Dr. Matzger's infringement assessment.

22.    The experimental design and instrument setup used by Dr. Matzger were inadequate to determine whether Cipla's tafamidis API and Cipla's ANDA product infringed claims 1 and 8-10 of the '441 patent.  Inadequate spatial resolution prevented analysis of individual crystals.  Inadequate spectral resolution (wavenumbers or Raman shift) prevented accurate location of peaks.

23.    Both the test instrument employed and the methodology used were completely unvalidated.  Therefore, the data generated is unsuitable for any purpose.

24.    Dr. Matzger misinterpreted random noise as peaks and failed to consider other possible explanations for the alleged peaks (had there been any).

25.    If Dr. Matzger had truly detected the infringing polymorph (Form 1) in Cipla's tafamidis API using PXRD, there should be at least 1% of the Raman spectra showing that form.  Despite obtaining approximately 250,000 data points of the API and the formulated drug product, Dr. Matzger did not generate even one definitive spectrum consistent with infringement.  This

demonstrates that his conclusions from PXRD and Raman analysis are inconsistent with each other and hence undermines his conclusion of infringement.

## VII.  APPLICABLE LEGAL PRINCIPLES

26.     In order to form my opinions in this report, I have relied on certain legal principles that have been explained to me by counsel for Cipla. My understanding of these legal principles is set forth below.

27.     I understand that Plaintiffs bear the burden of proving infringement by a preponderance of the evidence.  I understand that this means that Plaintiffs must prove that it is more likely than not that Cipla's ANDA product infringes the asserted patent claims in this case.  I understand that a dependent claim contains all of the limitations of the independent claim on which it depends and thus if the original independent claim is not infringed, the dependent claim cannot be infringed.  Based on my review of Matzger Report, I understand that in this case, we are only considering literal infringement.

28.     I have also been informed that the claims of a patent are judged from the perspective of a hypothetical person of ordinary skill in the art ("POSA").  The "art" is the field of technology to which the patent is related.

29.     In my opinion, a POSA as of the priority date of the '441 patent would have been a person with a Ph.D. and 3-5 years of experience or with a B.S. or a M.S. degree with at least five years of experience in the field of pharmaceutical science.[2]  Such a person will have a background in preparation, crystallization, and solid-state characterization of an API, using analytical techniques such as PXRD, Raman, infrared, solid state NMR.  A POSA would also be familiar with

---

[2] I have been informed by Counsel that there is a dispute over the exact priority date.  However, I note that my opinions are not dependent upon what the court finally determines as the priority date of the '441 patent.

the regulations and requirements pertaining to the analysis of drug materials as laid out by the United States Pharmacopeia ("USP"). Such a person would be working together in a multidisciplinary team with others, *e.g.*, synthetic organic chemists, formulators, and practicing physicians.

## VIII.    BACKGROUND

### A.    The '441 Patent

30.    I understand that Plaintiffs are currently asserting that Cipla's ANDA Product infringes claims 1, ████████████ of the '441 patent. However, since I am addressing Dr. Matzger's Raman Spectroscopy results, which included the discussion of claims 1, ███████ ████ of the '441 patent, I have not included the discussion of the remaining asserted claims in this report. The asserted claims read as follows:

> 1.    A crystalline form of 6-carboxy-2-(3,5-dichlorophenyl)-benzoxazole, wherein said crystalline form has an analytical parameter selected from the group consisting of
>
> a solid state NMR spectrum comprising 13C chemical shifts (ppm) at 120.8±0.2 and 127.7±0.2,
>
> a powder X-ray diffraction pattern comprising a peak at a diffraction angle (2θ) of 28.6±0.2, and
>
> a Raman spectrum comprising a Raman shift peak (cm-1) at 1292±2.





**B.**    **Raman Spectroscopy**

31.    Raman analysis involves the use of Raman spectroscopy, which is a spectroscopic technique used to observe vibrational, rotational, and other low-frequency modes in a system. Raman spectroscopy provides information about the bonds between atoms in the molecules of the material being analyzed and is commonly used in chemistry to provide a fingerprint by which molecules can be identified

32.    Raman spectra are gathered by shining a monochromatic light source (generally, a laser) on a sample and detecting the scattered light.  The majority of the scattered light is of the

same frequency as the excitation source. A very small amount of the scattered light (ca. $10^{-5}$% of the incident light intensity) is shifted in energy from the laser frequency due to interactions between the incident electromagnetic waves and the vibrational energy levels of the molecules in the sample. Plotting the intensity of this "shifted" light versus frequency results in a Raman spectrum of the sample.

33.     Raman spectra are plotted with respect to the laser frequency such that the scattered light at the same frequency as the laser lies at 0 cm$^{-1}$. On this scale, the band positions will lie at frequencies that correspond to the energy levels of different functional group vibrations. A Raman spectrum can thus be interpreted in a similar as an infrared absorption spectrum to identify the components of the sample. The resulting spectrum consists of the x-axis (horizontal) plotting "Raman shift," also called "wavenumbers." The units for this are "cm$^{-1}$" which is read as "reciprocal centimeters." The y-axis (vertical) is the intensity of the absorption of light, usually expressed as "counts."

### C.     Powder x-ray Diffraction versus Raman Spectroscopy

34.     I will not, in this report, opine on the specific PXRD data presented by Dr. Matzger in his report. I understand that this is being addressed by Dr. MacGillivray. It is, however, important to understand the differences between these two analytical methods so that their relative strengths and weaknesses can be appreciated.

35.     In some cases, PXRD can be performed on a single crystal. This generally requires a relatively large crystal (at least 100 μm). I ████████████████████████████████████ ████████████████████████████████████████████████ Thus, the drug particle size are too small for direct measurement of individual crystals by PXRD.

36.     In his report, Dr. Matzger utilized PXRD to study bulk amounts of the drug powder. While Dr. Matzger does not report the amount of drug used in his instrument, the typical amounts used vary between 100-1000 mg.  Assuming an approximate crystal density of 1 g/cm$^3$, ████████ ████████████████████████████████████████████████████  The point of this estimate is simply to demonstrate that using PXRD produces an average of everything in the sample and is not suitable for identifying individual crystals.

37.     PXRD can be used for measuring low levels of known crystalline impurities in a bulk material if several conditions are met.  These include:

    a.  Sufficient concentration for key peaks to be determined,

    b.  The presence of sufficiently unique peaks in the impurity, and

    c.  Demonstration of the absence of potentially interfering peaks in any other known or suspect impurities.

38.     A typical concentration requirement for concentration measurement with PXRD is in the percent range (>1 minor component per 100 major components).  The ramifications of this will be discussed below.

39.     In contrast, Raman spectroscopy uses a laser focused through an optical microscope. When properly configured, micro-Raman spectroscopy is capable of probing individual crystals down to the size range of individual tafamidis crystals.  Thus, while PXRD requires a relatively high concentration of an impurity, micro-Raman is capable of detecting single crystals at extremely low concentrations.

40.     In Raman analysis, spectra [singular = spectrum] are collected in one of two general manners – point spectra or maps.

    a.  A *point spectrum* is, as it implies, a spectrum obtained at one point in a sample.  For a bulk sample, the beam could be broad enough to encompass

many crystals and measure the average signal from the entire sample.  For a single crystal, when isolated from adjacent crystals, the beam can be tightly focused so that only the single crystal is the source of the signal.  For a single spectrum the sample can be irradiated for any amount of time desired by the operator to generate sufficient signal-to-noise for the task at hand.  Defining that required signal:noise ratio is a key part of experimental design.

b. A *map spectrum* describes one spectrum obtained from a large set of spectra taken over a relatively large area.  Typically, a spectrum is obtained in one tightly focused point and the sample is then moved a fixed distance (usually a few μm) and the next spectrum is measured.  By doing this over a grid of points, a "map" can be generated containing thousands of individual, separate spectra.  To accomplish this in a reasonable amount of time, each point is measured very quickly and this produces poor quality spectra that are, hopefully, adequate for the task at hand.  As with point spectra, defining the required signal:noise ratio is a key part of experimental design.

## IX.   DR. MATZGER'S RAMAN TESTING DOES NOT PROVE THAT CIPLA'S ANDA PRODUCT EXHIBITS THE CLAIMED RAMAN SHIFT PEAKS

41.     For the purposes of this report, I examined all of Dr. Matzger's Raman data files using the same software he used for his instrument/analysis: (WiRE version 5.6).  This software was used to prevent any possible alterations to the data that might occur if it was translated to the native formats of another program.  All figures I have generated were done using this software and no processing was performed unless explicitly stated.  The spectra presented are all screen captures directly from this software.  The legends in each Figure indicate the exact source file (and location, where appropriate) of the raw data.

11

A.    **The Instrumental Parameters Adopted by Dr. Matzger's for his Data Collection were Inadequate**

1.    **Instrument Set Up**

42.    As an initial matter, I note that pharmaceutical testing labs should be certified by an accredited conformity assessment body that ensures they meet certain defined levels of quality control. These standards have been established primarily by ISO (International Organization for Standardization). It is generally recognized in the field of analytical testing that compliant and certified laboratories have demonstrated their capability to generate trustworthy data and to form decisions that are based on reliable, accurate and reproducible information. Dr. Matzger did not provide any documentation demonstrating that ChemXLerate LLC, where he presumably generated the Raman data, is certified by any of the well-recognized agencies that audit and confirm compliance with these international quality standards.

43.    The Raman instrument used to generate Dr. Matzger's data was improperly set up and incapable of adequately measuring the peak locations that are key to his analyses and conclusions.

44.    All of the Raman data used by Dr. Matzger was collected using a 785 nm laser. However, the instrument he used also comes with a 532 nm laser, which is the laser that should have been used to objectively and accurately analyze Cipla's tafamidis API and the ANDA product. There are two primary reasons for this.

45.    First, the intensity of Raman scattering is inversely proportional to the laser wavelength to the power of four.[3] The longer wavelength that Dr. Matzger used produces much

---

[3] Jakob Thyr and Tomas Edvinsson, "Evading the Illusions: Identification of False Peaks in Micro-Raman Spectroscopy and Guidelines for Scientific Best Practice," *Angew. Chem. Int. Ed.* **2023**, *62*, e202219047 ("Thyr").

lower Raman excitation and that in turn necessitates longer irradiation time to generate the same signal-to-noise ratio that could have been obtained with a 532 nm laser at a relatively shorter exposure time.  Because of the strong intensity dependence on scattering frequency (or wavelength) for what seems like a small difference in laser frequency this results in a difference of 5X longer irradiation time.  This results in a much higher probability of damaging the sample – which indeed happened in his measurements – while generating the data.

46.    Second, the 532 nm laser produces a finer spot and would enable the analysis of individually smaller crystals.  Since Dr. Matzger was trying to demonstrate the presence of a specific crystalline form of tafamidis as an impurity, it was critical for him to isolate and identify individual crystals that he hopes to show infringe the patent.  However, inadequate setup prevented him from being able to do this requisite analysis of the individual crystals, as would be required for determining patent infringement.

47.    Additionally, the Raman instrument that Dr. Matzger used comes equipped with multiple gratings.  Grating selection is a major factor defining the wavelength resolution achievable in the spectra collected.  Pfizer contends Cipla's tafamidis API and the ANDA product contain minute quantities of crystalline tafamidis Form 1.  In order to set up experiments aiming to verify this, one needs to measure peak locations in the spectra with the highest precision possible.  In contrast, Dr. Matzger opted to utilize low precision.  He selected the 1200 lines/mm grating when the instrument had both 2400 lines/mm and 3600 lines/mm gratings available.  I have prepared Table 1 showing the difference between these options.

48.    In the table I evaluate three potential setups.  The first column is for the settings employed by Dr. Matzger.  The second column contains settings that are routinely available on his

instrument as sold. The third column lists settings that are available for high-precision work on his instrument had he wished to obtain the best data possible.



49.    The instrument and the set up employed by Dr. Matzger were set to collect data points every 1 cm$^{-1}$. This means that all locations between these points are being estimated by the instrument, not measured directly. Since Dr. Matzger ultimately relies on measurement accuracy of as fine as ███████ to reach his infringement conclusion (*see, e.g.*, Matzger Report Figure 42), the practical resolution and sampling frequency are inadequate to support his desired conclusions.



14

50.    The mapping data reported in Matzger Report was obtained with the laser set to illuminate the sample as a line, *not* a spot.  According to the metadata accompanying Dr. Matzger's maps, he selected a slit, not a spot, aperture.[4]    The difference between using a slit versus a spot aperture is that the slit would illuminate a line containing many crystals while a spot could, in principle, permit illuminating a single crystal.  In the current situation, where the infringement allegation relies on the presence of minor quantities of tafamidis Form 1 crystals, the use of a slit, as opposed to a spot aperture, renders his testing incapable of differentiating between potentially infringing crystals and surrounding components.

### 2.    Lack of Proper Calibration of the Instrument, Validation and Controls

51.    Matzger Report states (at ¶174) that he performed a single-point calibration "before each day's collection."  However, my understanding is, while Cipla's counsel requested copies of the calibration files to verify the calibrations, Plaintiffs did not provide any data to support his contention that the instrument was properly calibrated.  More critically, there was no evidence that validation was performed of either the instrument or the method used.

52.    It is axiomatic that no data can be accepted unless it can be shown to have been validated.  The requirements necessary for this are detailed in documents by various organizations.  One of the most recognized organizations in this regard, which is also cited by Dr. Matzger in his report (¶58), is the USP.  Whether one cites the outdated version of USP referenced by Dr. Matzger (chapter <1120> of the 2011 edition) or the current version (chapters <858> and <1858>), the requirements for validation remain the same.  The two key attributes for Operational Validation are Wavelength Accuracy and Photometric Precision.   These correspond to the x-axis and y-axis

---

[4] I note that while Dr. Matzger reports collecting data with a 50 µm slit, *see* Matzger Report ¶174, my review of the metadata underlying his testing data indicates that he actually used a 65 µm slit.

accuracy, respectively.  Due to the nature of the issues at hand, the photometric precision is not critical; however, wavelength accuracy certainly is critical.  Other international standards organizations, such as ASTM, also emphasize the essential nature of proper, multi-point calibration (i.e., ASTM E1840).

53.    Without proper wavelength validation, it is impossible to determine whether the peaks reported by the instrument software reflect the actual locations of the peaks.  This validation is so fundamental to Raman spectroscopy that the instrument used by Dr. Matzger has a built-in capability to record it automatically.  See Figure 1 below, taken from the WiRE software. Nevertheless, Dr. Matzger neglected this essential step.  Due to his failure to carry out this extremely critical step of USP-required validation of wavelength accuracy, all Raman data obtained by Dr. Matzger for his report are unacceptable and unreliable, according to USP.

**Figure 1.  Instrument Manual Instructions for Performance Qualification/Validation**



54.    In addition to the requirement of validating the instrument as described above, USP <858> also requires validation of the method used for making measurements.  This validation, to

be acceptable, requires a series of attributes including: accuracy, precision, specificity, quantitation limit, linearity, range and robustness. These requirements are briefly discussed below:

a. Accuracy: in the USP, this measures concentrations. This is important for quantitative studies and is not critical for this project.

b. Precision: this describes how repeatable the measurements are. For this study it would require repeated measurements of samples, preferably by different analysts or on different instruments. While this is also most critical in quantitative studies, ensuring repeatability is a required step in validation. It ensures that another analyst or using a different instrument would result in the same data and conclusions.

c. Specificity: this establishes that materials are correctly identified. It requires both positive controls (known materials must show all the characteristics of their known spectra) and negative controls (different materials that must not meet the criteria for being mis-identified as the material in question).

d. Quantitation limit: this is generally not relevant for qualitative analysis; however, determination that spiking compliant tafamidis with infringing tafamidis would permit ensuring that it is even possible to use this method to detect the impurity and could provide an estimate of the detection limit.

e. Linearity and range: these are critical for quantitative studies.

f. Robustness: this involves making intentional changes to the method used and seeing if the same results are obtained. For Raman, this might include changing focal points, extending laser excitation times to determine how

phase changes or decomposition would look, or different hardware settings (i.e., different lasers or different apertures).

55.    The specificity requirement of method validation of the USP expressly requires analyzing a positive control.  In the current scenario this would require first obtaining a spectrum of pure crystalline Form 1 of tafamidis and analyzing it to ensure that all Raman peaks correspond to those reported in the '411 patent.  Matzger Report does not reflect any such undertaking.  This was another critical oversight of Dr. Matzger's work for his report.  We have no way of knowing whether a sample of Form 1 tafamidis would contain the same peaks in the same locations reported in the patent when analyzed on Dr. Matzger's instrument.

56.    Likewise, the specificity requirement of method validation guideline of USP also requires carrying out analysis of negative control(s) not meeting the criteria of positive control. Here it would require that the spectra of pure Forms 4 and 6 be analyzed under the identical testing protocols to establish that they would not falsely show peaks ███████████ ██ ████████.  Without this testing there is no way to conclude that the testing and analysis performed can distinguish between the infringing and non-infringing forms of tafamidis.   Lack of a negative control experiment is a significant omission for validation of the method used by Dr. Matzger.

57.    ████████████████████████████████████████████████████

██████████████████████████    █████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████    ███

█    ██████████████████████████████████████████████████    ███

███ ███████████████████████████████████████ ███ ████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

58.     Phase transition and sample decomposition are well-known occurrences with Raman measurements that can lead to erroneous results.  *See e.g.*, Thyr at p. 13.  However, the Matzger Report contains no analysis of the crystalline form of Cipla's tafamidis API to observe how the spectrum changes after laser-induced phase changes or decomposition.   This is particularly critical since it is known that polymorphic forms of tafamidis can change due to heat (Masciocchi; Matzger Report ¶47).[8]   Likewise, Dr. Matzger did not perform testing and analysis of tafamidis crystalline Forms 4 and 6 or any of the excipients present in Cipla's ANDA product to determine any change in the Raman peak pattern following laser-induced phase changes or decomposition. The complete lack of spectrometer validation coupled with no control experiments completely annuls the accuracy of the data and renders it unusable for any purpose, let alone infringement analysis of Cipla's ANDA product.   The lack of control experiments also renders the tests performed and analysis conducted entirely meaningless.

---

█ ██████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████

█ ██████████████████████████████████████████████████████████████
█████████████████████████████████████

█ ██████████████████████████████████████████████████████████████
█████████████████████████████████████████████

[8] Norberto Masciocchi, *et al.*, "Thermal and Structural Characterization of Two Crystalline Polymorphs of Tafamidis Free Acid," *Molecules* **2022**, *27*, 7411, 1-13 ("Masciocchi").

B.    **Dr. Matzger's Interpretation of The Data Was Flawed**

59.    The '441 patent provides Raman spectra of crystalline Form 1 of tafamidis (Figure 5) and two other polymorphs – crystalline Form 4 (Figure 7) and Form 6 (Figure 16).  Only Form 1 is listed as having a peak ███████ ██.  In contrast, both other forms have "shoulders" on the "left" sides of the ████ ██ ███.  By "shoulder" I mean that the side of ███████ ██ ██ does not return directly to the baseline; rather, it slowly decreases in an irregular fashion.

60.    A probable cause of the shoulders is from underlying small peaks that are close to each other.  Since the peaks are small and indistinct, there is no way to know with confidence the exact number and location of them.  While one can use mathematical models to guess, there is no way to know for certain.  Given the overlapping nature of peaks in this region (████ ██) between different polymorphic forms of tafamidis, a POSA would understand that attempting to guess the location of an underlying peak in this part of the spectra in a different polymorphic form of tafamidis for the purpose of infringement analysis would not be relevant or appropriate.

61.    Dr. Matzger attempts to extract the existence of peaks from shoulders only for selected data where there is clearly no definable peak.  For further discussion on problems with this approach of analysis see ¶77 below.

62.    Dr. Matzger makes no attempt to distinguish between spectra from an infringing crystal and any other source.  As I have explained above, it is possible to analyze individual crystals using the equipment employed by Dr. Matzger.  However, due to improper instrument setup and sample preparation, the spectra obtained by him show the results from many individual crystals, mainly Cipla's crystalline form of tafamidis.  With proper setup individual crystals could have been analyzed; however, due to the improper setup conditions used, the data show the results from multiple crystals instead.  From these spectra Dr. Matzger attempted to find any possible evidence

for the existence of a peak around the ▓▓▓▓ ▓▓ window, as required by Claim 1 of the '441 patent. However, according to Dr. Matzger's report, the claim requires that a crystal of Form 1 tafamidis possesses this specific analytical characteristic. The presence of any non-polymorphic impurities, starting materials or by-products would not constitute infringement even if they had a peak within that window.

63.    Dr. Matzger makes no attempt to distinguish between these possible sources, random noise or artifacts in determining infringement. While he could have analyzed individual crystals to determine if they had all the necessary requirements for infringement, he overlooked all other possible explanations.

64.    ████████████████████████████████████████████ ████████████████████████████████████████████ The most common impurities in drug substances are typically residual starting materials, the impurities in the starting materials and inadvertent by-products of the synthetic process. Since these compounds would all share many common features with the intended final drug molecule, it is not surprising that they also have many common spectral features. Could any of these compounds be responsible for the one peak he locates in either the Raman spectrum or the PXRD spectrum? Matzger makes no attempt to resolve this issue.

65.    When analyzing the formulated product, these issues become even more noteworthy due to the presence of additional components (*i.e.*, the excipients) and any potential impurities associated with those. Due to the absence of properly analyzed controls in Dr. Matzger's testing and analysis of these materials no valid conclusions can be drawn regarding infringement.

### C.    Underlying Data in Dr. Matzger's Report is Unreliable

#### 1.    Presence of artifacts

66.    Artifacts are spurious peaks that have nothing to do with the material being analyzed. These can be from cosmic rays or electronic "glitches."  Dr. Matzger's map data show spurious peaks ▮▮▮▮▮▮  ▮▮▮ that do not correspond to any underlying drug.  Figure 2 below illustrates one such example.  While artifact peaks from cosmic rays are common occurrences in Raman spectra, they are almost always a single point wide and extremely intense.



67.    Figure 3 below shows another spectrum within the same map where the ratio of artifact to underlying drug is much smaller.  If it were still smaller, it would be indistinguishable from the drug containing that peak.  Only a repeat analysis would permit one to distinguish between the Cipla's API or the ANDA product with an artifact and a "true" peak.  In fact, spurious artifact peaks like this occur at many different x-axis locations in many different map locations.  Dr. Matzger never repeated the analysis of any location where he believes that an infringing crystal has been located, which would be required to ensure that these are actual peaks instead of artifacts.



### 2. Sample Decomposition

68.    As I mentioned above, during the Raman data collection when irradiated by an intense laser beam there is frequently damage to the material.  Focusing a laser on a small area produces local heating.  This can result in phase transformations as well as decomposition of the material.  The damage starts out with subtle changes to the spectra but progresses to complete burning of the sample.  This would not be consistent from location to location.  It is often the case that under identical conditions one crystal may burn up while others are unscathed.  It is essential to know whether a ██████ peak is produced during decomposition of the Cipla form of tafamidis.  This experiment could have been easily done by repeatedly analyzing one location until decomposition begins, as determined by changes to the spectrum.  Also, as decomposition begins, some peaks get broader and lose their sharpness.

69.    Several locations in Dr. Matzger's map data show clear evidence of sample decomposition.  This is one possible reason that could lead to artifactual production of peaks in the ██████ ███████.  The essential way to determine and thus avoid this occurrence would have been to analyze negative controls of Forms 4 and 6 and determine whether they produced peaks in this region either before or after decomposition.  As I have mentioned earlier, these control experiments were not performed by Dr. Matzger, which makes his analysis untrustworthy.

70.     Another way to determine if decomposition is evident in the existing data is to look for changes in peak ratios and sharpness in the cited spectra.  For example, the Raman peak at ███ ███ as shown in the '441 patent is quite sharp and is similar in intensity to those at ████████ ███.  The '441 patent shows that these latter two peaks also exist clearly in the other forms of the drug so they can act as internal reference points.  While the locations of these latter two peaks vary slightly between the tafamidis polymorphs described in the patent, the patterns and intensities are consistent.

71.     Examination Dr. Matzger's mapping data, ██████████████, shows that the peaks ████████████ ████ █████ are lacking and show no clear resolution.  Figure 4 below shows the three spectra cited in Matzger Report Figures █████, which are three different locations in the map from one sample.  The peaks at ██████████████ ███ are non-existent but part of a much broader feature with no distinct peaks.  This is a characteristic of sample degradation.  In contrast, Figure 5 shows a spectrum of the same region from the same sample but of an area not showing apparent degradation.





### 3.     Misinterpretation of noise as peaks

72.     Most of the map data produced by Dr. Matzger in his report suffer from extremely high levels of noise.  The assignment of peak locations becomes quite arbitrary when even the presence of a peak is uncertain.  Figure 6 shows the exact data produced by Dr. Matzger in his ▮▮▮▮▮ but expanded for clarity.  The noise level throughout, but especially in the critical region around ▮▮ ▮▮, is extremely high.



73.     Since the spectrum shows no visible peaks between ███████████, I performed a point-to-point noise calculation. ████████████████████████████████

████████████████████████████████████████████████

██████ ████ ██████████████████████████████ █████ ██████████████████

██████ ████ ██████ ████████████████████████████████████████████

██████████████     This calculation indicates that neither of these two features could be considered anything other than random noise.

74.     Another way to see that these map spectra show mainly noise is to examine two other locations reported by Dr. Matzger as demonstrating peaks at ████ ████ Figures 7 and 8 are reproductions of the data from Matzger Report Figures ████████ The figures below overlay the spectrum reported as showing the peak with the two adjacent map points. The abundance of noise in this general region is evident and supports the conclusion that the reported peaks are just random noise. As with the artifact issue described above, eliminating the false identification of noise as peaks would have required Dr. Matzger to repeat the analyses of the suspect locations – something he consistently failed to do.

75.     In sum, by not properly evaluating the locations where he considers infringing particles to be present and performing testing to eliminate the obvious other explanations for his findings Dr. Matzger reveals a bias against the proper conclusions from his data – that his testing and analysis failed to detect any infringing crystals in Cipla's tafamidis API and the ANDA product.



4. **Data Manipulation**

76.     Deconvolution is a mathematical tool that allows one to estimate the locations and intensities of peaks where there are multiple overlapping peaks.  Dr. Matzger used this tool inconsistently in his analysis.  He applied this to point spectra (where he never sees a peak at ███ ███) in order to extract a peak from the underlying shoulder.  He avoided this technique for the map spectra since the noisy map spectra do not show this peak as present when deconvoluted.  One problem with this deconvolution technique is that the peak(s) it attempts to fit are based on operator input and therefore subject to bias based on the exact starting locations from the operator.  If the data from the Matzger Report Figure 13 is deconvoluted using the identical program we find that the underlying peak is at ███, which is outside the patent window of ███ ███ even allowing for rounding.  Figure 9 shows my deconvolution of the identical data analyzed by Dr. Matzger in his Figure 9.  Dr. Matzger's use of deconvolution to invent peaks where they are not otherwise present does not support the conclusion of infringement.



77.    Baselining is a common manipulation and is used to make the data more attractive. It can, however, shift peak locations slightly since on a non-flat baseline subtraction, one side of a peak will be reduced differently than the other side.  This is specifically a problem for this data since a difference of less than 0.1 cm$^{-1}$ can move peaks inside or outside of the claimed range and Dr. Matzger carried out baselining on selected data.

78.    Dr. Matzger used "rounding" on a number of data points to support his infringement theory.  Rounding refers to taking numbers with decimal places and reporting them as whole numbers.  The instrument itself records Raman shifts (the horizontal axis) to at least two decimal places (i.e., ███ in Figure 9, above).  Dr. Matzger is selective in reporting additional decimal places in his report.

79.    Rounding is not specified in the '441 patent.  Claim 1 clearly specifies a peak location of 1292 ± 2 cm$^{-1}$.  By using rounding to his advantage, Dr. Matzger improperly rewrites the claim to expand the range from 1289.50 – 1294.50 cm$^{-1}$.  If one subtracts these two limits we see a difference of 5.00 cm$^{-1}$, which corresponds to a range of ± 2.5 cm$^{-1}$.  This is a 25% expansion of the limits specified by the claims.  In this case, for Raman peak analysis the patent recited a range of ±2 cm$^{-1}$ and not ±2.5 cm$^{-1}$.  If the patent intended rounding to be included, it could easily have specified the broader range of ±2.5 cm$^{-1}$.  Decimal places are used in the patent for PXRD (± 0.2) and solid-state $^{13}$C NMR spectra (± 0.2) and could have been used, if intended, for the Raman specification.

80.    If the actual limits of ±2 cm$^{-1}$ specified in the patent were obeyed by Dr. Matzger, all of the drug sample data he reports, even with deconvolution, would be outside the claimed range. Table 2 below summarizes the locations of the deconvoluted peaks he reports.



81.    Further, without manipulations, even with rounding, peaks from Matzger Report do not fall within the claimed window. 



**D.** <u>**Remaining Claims**</u>

82.    Since Dr. Matzger has failed to show the presence of a peak at ████ ███, he has failed to show infringement of any other claims discussed in the Raman analysis of his report. Nevertheless, I address below some of his specific allegations regarding the dependent claims.

83.    Dr. Matzger incorrectly concludes that ██████ of the '441 patent is infringed.  He notes that the Cipla drug substance ████████████████ appear to contain the peaks specified in this claim: ████ ████ ████ ████ ████████ ██████  The patent specifies the same experimental error windows for all Raman peaks (±2 cm$^{-1}$).  However, I note that the underlying data from ██████ ██ ████████████████████████████████████████ ██ ████████████ ██ ████████████ ██ which for the reasons I mentioned above, should be outside the claimed range.  Dr. Matzger improperly relies on rounding to expand the scope of the claims in a manner not discussed in the patent to reach this conclusion.  Figures 13 and 14 show his data with the additional decimal supplied by the software.





84.     As shown in Figures 15 and 16, when we apply deconvolution to this data ████ ███████████████████████, as done by Dr. Matzger for the ████████ peak, these two peaks shift down to ███████████████████████████. Therefore, Dr. Matzger would require a wavelength error of less than ████ ████ for Figure 15 data to round up into the window and even with rounding his Figure ██ data would be outside of the claim window. This demonstrates that Claim 8 is not infringed according to Dr. Matzger's data. The data in Figure 15 was subjected to default baselining prior to deconvolution.



85.    Dr. Matzger states (Matzger Report ¶186) that he is NOT offering an opinion about claims 9 and 10; however, he then proceeds to claim infringement.  The data he cites (from his ███████ ███ ████████████████████████████ ████ His data, reproduced below as Figure 17, shows only peaks outside the specified window.  He posits that "the POSA would interpret these results as suggesting that the missing peak at █████ ████ was simply below the detection limit." However, in my opinion a POSA or any chemist would conclude that the absence of an infringing peak in the spectrum of the alleged infringing material only provides support for the conclusion that

34

it is not, in fact, an infringing material. This shows that any allegation of infringement of claims 9 and 10 by Cipla's tafamidis API and Cipla's ANDA product is unsupported.



86.    In the Table 3 below I included a summary of all the data provided by Dr. Matzger in his Figures and the reasons the data do not demonstrate infringement. A cross-reference to the Figures supporting this within this report is included in the table.

**Table 3. List of Dr. Matzger's data and reasons for rejection**

| Figure number in Matzger Report | Data in Matzger Report | Type | Response | Figures in Spingarn Report |
|---|---|---|---|---|
| | | Point spectrum | | |
| | | Point spectrum | | |
| | | Map | | |
| | | Point spectrum | | |
| | | Point spectrum | | |

| Figure number in Matzger Report | Data in Matzger Report | Type | Response | Figures in Spingarn Report |
|---|---|---|---|---|
| | | Map | | |
| | | Map | | |
| | | Map | | |
| | | Point spectrum | | |
| | | Point spectrum | | |
| | | Point spectrum | | |
| | | Point spectrum | | |
| | | Map | | |
| | | Point spectrum | | |
| | | Map | | |
| | | Map | | |







87.     Finally, claims ████ of the '441 patent depend ████. Since Dr. Matzger's data failed to support any infringement of claim 1 by Cipla's ANDA product, there cannot be any infringement of claims ████ of the '441 patent either.

## X.    <u>CONCLUSIONS</u>

88.     For the reasons discussed above, based upon my analysis of Dr. Matzger's Raman data, it is my opinion that Cipla's ANDA product does not infringe claims 1 ████ ████ of the '441 patent.

89.     The experimental design and instrument setup used by Dr. Matzger were inadequate to determine whether Cipla's tafamidis API or Cipla's ANDA product infringes claims 1, ████ ████ of the '441 patent.  Both the test instrument employed and the methodology used were completely unvalidated.  Additionally, there are several critical issues with the underlying data and its interpretation.  Accordingly, the data generated and subsequent conclusions are unsuitable for the purpose of infringement analysis.

Dated: _____15 Sept 2025_____    By: _____

Neil E. Spingarn, Ph.D.

Exhibit A

# Recent Legal Case Listing

Depositions Given

| J/N | Code | Court | Date | Case Name |
|---|---|---|---|---|
| 23844 | wp | District – CA Central | 4/7/21 | Amavizca v Nutra |
| 23163 | jfhlaw | Superior – San Diego, CA | 5/19/21 | Hassaine v Costco |
| 24486 | wp | District – CA Central | 6/17/21 | Hollins v Walmart |
| 23023 | naulaw | Superior – San Diego, CA | 7/15/21 | Gowland v NUWI Vistamonte |
| 24708 | bdlaw | Superior – Orange, CA | 9/1/21 | DeComparan v 4th Street Market |
| 26252 | carcass | District – New Jersey | 11/4/21 | Eisai v Sun Pharmaceuticals |
| 22584 | wp | District – New York | 1/10/22 | Jackson-Mau v Walgreen |
| 26400 | kars | Superior – Orange, CA | 3/1/23 | Soulierre v Suzuki |
| 25729 | loclaw | District – Las Vegas, NV | 6/2/23 | Underwood v O'Reilly Auto |
| 04100011 | mallet | District – Western PA | 6/13/23 | Mallet v Lacayo |
| 24167 | uvto | Superior – Orange, CA | 5/23/24 | Continuing Life v Hensel Phelps |

Trial Testimony Given

| J/N | Code | Court | Date | Case Name |
|---|---|---|---|---|
| 24486 | wp | District – CA Central | 7/12/21 | Hollins v Walmart |
| 23163 | jfhlaw | Superior – San Diego, CA | 10/12/22 | Hassaine v Costco |
| 26400 | kars | Superior – Orange, CA | 4/3/23 | Soulierre v Suzuki |

Exhibit B

## Materials Considered by Neil E. Spingarn, Ph.D.

| Description | Exhibit No |
|---|---|
| Curriculum Vitae of Neil E. Spingarn, Ph.D. | C |
| U.S. Patent No. 9,770,441 (Das Exhibit 18) | N/A |
| Opening Expert Report of Adam Matzger, Ph.D. | N/A |
| CTAF 006931 (3.2.S.1.3 General Properties) | N/A |
| Evading the Illusions: Identification of False Peaks in Micro-Raman Spectroscopy and Guidelines for Scientific Best Practice, Angew. Chem. Int. Ed. **2023**, *62*, e202219047 ("Thyr"). | N/A |
| USP General Chapter 1120 – Raman Spectroscopy (2011 edition) | N/A |
| USP General Chapter 858 - Raman Spectroscopy (official as of Nov 1, 2020) | N/A |
| USP General Chapter 1858, Raman Spectroscopy -Theory and Practice (official as of Nov 1, 2020) | N/A |
| ASTM E1840-96(2022): Standard Guide for Raman Shift Standards for Spectrometer Calibration (official as of 2022) | N/A |
| ███████████████████████████████ | N/A |
| ███████████████████████████████ | N/A |
| ███████████████████████████████ | N/A |
| Norberto Masciocchi, *et al.*, "Thermal and Structural Characterization of Two Crystalline Polymorphs of Tafamidis Free Acid," *Molecules* **2022**, *27 (*21), 7411, 1-13 ("Masciocchi"). | N/A |
| ███████████████████████████████ | N/A |
| ███████████████████████████████ | N/A |
| Any materials identified in my attached expert report and not cited above | |

Exhibit C

# CURRICULUM VITAE

| | |
|---|---|
| Name: | Neil Spingarn |
| Citizenship: | USA |

| | |
|---|---|
| Address - | S&N Labs, Inc. |
| | 13071 Marcy Ranch Road |
| | Santa Ana, California 92705 |
| | (714) 366-5227 (cell) |

## **Education**:

| | | | |
|---|---|---|---|
| Yale University New Haven, CT | Ph.D. | 9/74 - 12/78 | Pharmacology |
| Yale University | M.S., M.Phil. | 9/74 - 12/76 | Pharmacology |
| University of California | B.A. | 9/71 - 6/74 | Biochemistry |

## **Professional Experience**:

| | |
|---|---|
| 2022 – 2023 | Senior Principal Scientist Eurofins SFA SN Special Analysis West Santa Ana, CA |
| 1984 – present | President S & N Labs Santa Ana, CA |
| 1985 – 1988 | Instructor Hazardous Material Management Program University of California, Irvine, CA |
| 1980 – 1984 | Commercial Director IT Analytical Services Cerritos, CA |
| 1980 – 1981 | Assistant Professor Department of Pharmacology University of California, Los Angeles, CA |
| 1978 – 1980 | Postdoctoral Research Fellow American Health Foundation Valhalla, NY |
| 1979 | Visiting Scientist National Cancer Center Research Institute Tokyo, Japan |
| 1977 | Lecturer in Chemistry University of New Haven New Haven, CT |

Professional Societies:

Sigma Xi
American Chemical Society
Society for Applied Spectroscopy
American Society for Materials

Honors:

Fellow, NSF National Needs Postdoctoral Fellowship,  1978-1979
Fellow, National Cancer Institute Postdoctoral Fellowship,  1979-1980
Fellow, US-Japan Cooperative Cancer Research Program,  1979

Job  Description:

Laboratory Director and Founder of a consulting and independent analytical laboratory servicing the legal, academic and industrial communities.   S&N Labs provides consulting on state-of-the art microanalysis in various specialties within science, engineering and medicine.  Job function includes supervision of other experts as well as to providing direct consulting and analytical expertise.

Specific expertise is provided in all aspects of microanalysis, using such tools as Fourier-transform infrared microspectroscopy (FTIR),  Raman spectroscopy,   secondary ion mass spectroscopy (SIMS), scanning electron microscopy with energy-dispersive x-ray microanalysis (SEM- EDX), gas and liquid chromatography (GC and HPLC), combined chromatography-mass spectroscopy (GC- MS; LC-MS), thermal analysis and polarized light microscopy (PLM).  Additional expertise is provided interpreting our findings and those of other laboratories related to pharmaceutics, forensics and toxicology.

Special Skills:

Microscopy (forensics, single particle or fiber identification)
Microanalytical chemistry (FT-IR, Raman, electron microscopy, x-ray analysis, etc.)
Surface analysis
Failure analysis
Bioassays (microbial mutagenicity, toxicology, drug efficacy and levels)

# PUBLICATIONS

## I.    Research Articles

1.    McCann, J.,  N.E.  Spingarn,  J. Kobori and B.N. Ames, *Proc. Nat. Acad. Sci. USA* 72:979-983  (1975)  "Detection of carcinogens as mutagens:  improved tester strains incorporating an R-factor.

2.    Spingarn,  N.E. and A.C. Sartorelli,  *J. Med. Chem.* 22:1314-1317  (1979)  "Synthesis and evaluation of the thiosemicarbazone, dithiocarbazonate, and 2'-pyridylhydrazone of pyrazinecarboxaldehyde as agents for the treatment of iron overload".

3.    Spingarn,  N.E. and A.C. Sartorelli,  *Int. J. Quantum Chem.*  18:493-500  (1980) "Mechanism of binding of iron to potential therapeutic chelating agents".

4.    Spingarn,  N.E. and C.T. Garvie,  *J. Agric. Food Chem.*  27:1319-1321  (1979)  "Formation of mutagens in sugar-ammonia model systems".

5.    Spingarn,  N.E. and J.H. Weisburger,  *Cancer Letters*  7:259-264  (1979)  "Formation of mutagens in cooked foods. I. Beef".

6.    Spingarn,  N.E.,  L.A.  Slocum and J.H. Weisburger,  *Cancer Letters*  9:7-12  (1980) "Formation of mutagens in cooked foods. II.  Foods with high starch content".

7.    Spingarn,  N.E.,  H. Kasai,  L.L. Vuolo,  S. Nishimura,  Z. Yamaizumi,  T. Sugimura,  T. Matsushima and J.H. Weisburger,  *Cancer Letters*  9:177-183  (1980)  "Formation of mutagens in cooked foods. III. Isolation of a potent mutagen from beef".

8.    Kasai,  H.,  Z. Yamaizumi,  K. Wakabayashi,  M. Nagao,  T. Sugimura,  S. Yokoyama,  T. Miyazawa,  N.E. Spingarn,  J.H. Weisburger  and  S. Nishimura,  *Proc. Japan Acad. Sci.*  56B:278-283 (1980)  "Potent novel mutagens produced by broiling fish under normal conditions".

9.    Weisburger,  J.H.,  B.S. Reddy,  P. Hill,  L.A. Cohen,  N.E. Spingarn  and  E.L. Wynder, *Bull. N.Y. Acad. Med.*  56:673-696  (1980)  "Nutrition and Cancer – on the mechanisms bearing on causes of cancers of the colon, breast, prostate and stomach".

10.    Spingarn,  N.E.,  C.T. Garvie-Gould  and  L.L. Vuolo,  *Analytical Chem.*  53:565-566  (1981) "Analysis of methanol for reverse-phase gradient elution liquid chromatography".

11.    Spingarn,  N.E.,  C.T. Garvie-Gould,  L.L. Vuolo  and  J.H. Weisburger,  *Cancer Letters* 12:93-97  (1981)  "Formation of mutagens in cooked foods. IV.  Effect of fat content on mutagenicity of fried beef patties".

12.    Weisburger, J.H.,  N.E. Spingarn,  Y.Y. Wang  and  L.L. Vuolo,  *Cancer Bull.*  33:124-129 (1981)  "Assessment of the role of mutagens and endogenous factors in large bowel cancer".

13.    Kasai,  H.,  Z. Yamaizumi,  S. Nishimura,  K. Wakabayashi,  M. Nagao,  T. Sugimura,  N.E. Spingarn,  J.H.  Weisburger,  S. Yokoyama  and  T. Miyazawa,  *J. Chem. Soc. [Perkin I]*  8:2290-2293 (1981)  "A potent mutagen in broiled fish. Part 1. 2-amino-3methyl-3H-imidazo[4,5]quinoline".

14.    Wang, Y.Y.,  L.L. Vuolo,  N.E. Spingarn  and  J.H. Weisburger,  *Cancer Letters*  16:179-189 (1982)  "Formation of mutagens in cooked foods. V. The mutagen reducing effect of soy protein concentrates and antioxidants during the frying of beef".

15.    Spingarn, N.E., C.T. Garvie-Gould and L.A. Slocum, *J. Agric. Food Chem.* 13:301-304 (1983) "Formation of mutagens in sugar-amino acid model systems".

16.    Spingarn, N.E., D.J. Northington and T. Pressely, *J. Chrom. Sci.* 20:286-289 (1982) "Analysis of volatile hazardous substances by gas chromatography-mass spectroscopy".

17.    Spingarn, N.E., D.J. Northington and T. Pressely, *J. Chrom. Sci.* 20:571-574 (1982) "Analysis of non-volatile substances by gas chromatography-mass spectroscopy".

18.    Mills, W.J., B. J. Grigg, F.J. Offermann, B.E. Gustin and N.E. Spingarn, *J. Occ. Env. Hygiene* 9:D95-102 (2012) "Toluene and methyl ethyl ketone exposure from a commercially available contact adhesive"

19.    Araneda, J.F., T. Chu, M.C. Leclerc, S.D. Riegel and N. Spingarn, Anal. Methods 12:4853-7 (2020) "Quantitative analysis of cannabinoids using benchtop NMR instruments"

20.    Miller, E.A., K.M. Yamahara, C. French, N. Spingarn, J.M. Birch and K.S. VanHoutan, *Nature* Scientific Data 9:780 (2022) "A Raman spectral reference library of potential anthropogenic and biologic ocean polymers"


## II.    Books and Chapters

1.    Spingarn, N.E., thesis for Yale University Graduate School, Department of Pharmacology (1978) "Development of iron chelators for the treatment of chronic iron overload".

2.    Weisburger, J.H. and N.E. Spingarn, in: *Naturally-occurring Carcinogens-Mutagens and Modulators of Carcinogenesis* (J.A. Miller, E.C. Miller, T. Sugimura, S. Takayama and I. Hirano, eds.) University park Press, Baltimore, pp 177-184 (1979) "Mutagens as a function of mode of cooking of meat".

3.    Weisburger, J.H., B.S. Reddy, N.E. Spingarn and E.L. Wynder, in: *Colo-rectal Cancer: Prevention, Epidemiology and Screening* (S.J. Winawer, D. Schottenfeld and P. Sherlock, eds.) Raven press, new York, pp 19-41 (1980) "Current views on the mechanisms involved in the etiology of colorectal cancer".

4.    Weisburger, J.H., B.S. Reddy, N.E. Spingarn, L.A. Cohen, A Rivenson, J. Silverman and G.M. Williams, in: *Uitkomst en Uitzicht* (H. Maarse and B.J. Tinbergen, eds.) Pudoc, Wageningen, Netherlands, pp 201-215 (1980) "Nutrition and Cancer in man: experimental approaches".

5.    Weisburger, J.H., B.S. Reddy, E.S. Fiala, Y.Y. Wang, L.L. Vuolo, E.L. Wynder and N.E. Spingarn, in: *Cancer: Achievements, Challenges and Prospects for the 1980s* (J. Burchnall and J. Oettgen, eds.) Grune and Stratton, New York, pp 595-612 (1981) "Dietary factors in the causation and prevention of neoplasia".

6.    Wynder, E.L., G.D. McCoy, B.S. Reddy, L. Cohen, P. Hill, N.E. Spingarn and J.H. Weisburger, in: *Nutrition and Cancer* (N.M. Ellison and G.R. Newell, eds.) Raven Press, New York, pp 11-48 (1981) "Nutrition and metabolic epidemiology of cancers of the oral cavity, esophagus, colon, breast, prostate and stomach".

7.    Barnes, W., N.E. Spingarn, C. Garvie-Gould, L.L. Vuolo, Y.Y. Wang and J.H. Weisburger, in: *The Maillard Reaction in Foods and Nutrition* (G.R. Waller and M.S. Feather, eds.) American Chemical Society, pp 485-506 (1983) "Mutagens in cooked foods: possible consequences of the Maillard reaction".