# EXHIBIT 13

# UNREDACTED PUBLIC VERSION

Case 1:23-cv-00879-GBW-CJB   Document 278-9   Filed 01/26/26   Page 2 of 7 PageID #: 2597

12/17/2025    Pfizer Inc. et al. vs Dexcel Pharma Tech. Limited, et al.    Adam Matzger, Ph.D.
Confidential

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

----------------------------------X
PFIZER INC., FOLDRX             :
PHARMACEUTICALS, LLC, PF PRISM  :
IMB B.V., WYETH LLC, AND THE    :
SCRIPPS RESEARCH INSTITUTE,     :
                                :
          Plaintiffs,           :
                                :
                                : Case No.
     v.                         : 23-879-GWB-CJB
                                :
DEXCEL PHARMA TECHNOLOGIES      :
LIMITED, ET AL.,                :
                                :
          Defendants.           :
----------------------------------X

***** CONFIDENTIAL *****

Deposition of ADAM MATZGER, Ph.D.

Washington, D.C.

Wednesday, December 17, 2025

9:04 a.m.

Reported by: Amanda Blomstrom, RMR, CRR
CSR TX #8785/IL #84-3634/CA #12681

_____

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

Case 1:23-cv-00879-GBW-CJB   Document 278-9   Filed 01/26/26   Page 3 of 7 PageID #: 2598

12/17/2025    Pfizer Inc. et al. vs Dexcel Pharma Tech. Limited, et al.    Adam Matzger, Ph.D.
Confidential

Page 2

    1
    2         Videotaped deposition of ADAM MATZGER,
    3   Ph.D., taken on behalf of the Defendants, beginning
    4   at 9:04 a.m., on Wednesday, December 17, 2025, at the
    5   law offices of Williams & Connolly, 680 Maine Avenue,
    6   SW, Washington, D.C. 20024, before Amanda Blomstrom,
    7   RMR, CRR, CSR, and Notary Public of the District of
    8   Columbia and State of South Carolina.

Page 3

    1                    APPEARANCES
    2   ON BEHALF OF THE PLAINTIFFS PFIZER and THE SCRIPPS
        RESEARCH INSTITUTE:
    3
                CHRISTOPHER J. MANDERNACH, ESQUIRE
    4           AYELET EVRONY, ESQUIRE
                WILLIAMS & CONNOLLY, LLP
    5           680 Maine Avenue, SW
                Washington, D.C. 20024
    6           202.434.5138
                cmanderach@wc.com
    7           aevrony@wc.com
    8
        ON BEHALF OF THE DEFENDANT CIPLA:
    9
                JOSHUA I. MILLER, ESQUIRE
   10           WINDELS MARX LANE & MITTENDORF, LLP
                One Giralda Farms
   11           Madison, New Jersey 07940
                973.966.3238
   12           jmiller@windelsmarx.com
   13
        ALSO PRESENT:
   14
           DeSHAWN WHITE
   15           Videographer

Page 4

    1                    INDEX
    2   EXAMINATION OF ADAM MATZGER, Ph.D.              PAGE
    3   BY MR. MILLER                                      7
    4
    5
                         E X H I B I T S
    6
        NUMBER    DESCRIPTION                            PAGE
    7
          1       United States Patent 9,770,441 B1       10
    8
    9   2         Opening Expert Report of Adam           10
                  Matzger, Ph.D.
   10
        3         Reply Expert Report of Adam             12
   11             Matzger, Ph.D. as to Cipla Limited
   12   4         Adam Matzger Lab Notebook XX,           18
                  Bates PFZ_00000095 through 00000102
   13
          5       Adam Matzger Lab Notebook XX,           18
   14             with no Bates stamps
   15   6         List of files produced to Cipla in      30
                  the litigation with "Title" and
   16             "Extension" columns
   17   7         Adam Matzger Lab Notebook XXIII,        90
                  Bates PFZ_00000101 through 00000107
   18
          8       USP General Chapter 858, Raman         128
   19             Spectroscopy, Bates CIPEXP000022
   20   9         Protective Order dated 1/11/24,        153
                  signed by Adam Matzger

Page 5

    1             E X H I B I T S (Cont'd)
    2   NUMBER    DESCRIPTION                            PAGE
    3   10        Angewandte Chemie, "Evading the        234
                  Illusions:  Identification of False
    4             Peaks in Micro-Raman Spectroscopy and
                  Guidelines for Scientific Best Practice,"
    5             by Jakob Thyr and Tomas Edvinsson
    6   11        Blowup of the figure between Paragraphs 274
                  185 and 186 of Dr. Zaworotko's report
    7
        12        Page titled "Cosmic Ray Detection      289
    8             Wizard"
    9   13        Screenshot of cosmic ray removal using 292
                  default settings for map processing from
   10             the AJM-XX-1.5 map

Case 1:23-cv-00879-GBW-CJB   Document 278-9   Filed 01/26/26   Page 4 of 7 PageID #: 2599

12/17/2025        Pfizer Inc. et al. vs Dexcel Pharma Tech. Limited, et al.        Adam Matzger, Ph.D.
                                        Confidential

Page 6

1     THE VIDEOGRAPHER: This is Video No. 1 of
2  the video-recorded deposition of Dr. Adam Matzger, in
3  the matter of Pfizer Inc., et al., vs. Dexcel Pharma
4  Technologies, Limited, et al., in the United States
5  District Court, District of Delaware, Case No. 23-
6  789-GBW-CJB.
7     This deposition is being held at
8  Williams & Connolly LLP, 680 Maine Avenue, Southwest,
9  Washington, D.C., on December 17th, 2025. The time
10 on the video screen is 9:04 a.m.
11    My name is DeShawn White. I am the legal
12 videographer from Digital Evidence Group. The court
13 reporter is Amanda Blomstrom, in association with
14 Digital Evidence Group.
15    Will counsel please introduce themselves
16 for the record, followed by the court reporter
17 administrating the oath.
18    MR. MILLER: Joshua Miller, from Windels
19 Marx Lane & Mittendorf, on behalf of Defendant Cipla
20 Limited.
21    MR. MANDERNACH: Chris Mandernach, from
22 the Law Offices of Williams & Connolly, on behalf of

Page 7

1  the Plaintiffs entity -- Plaintiff entities. And
2  with me today is Ayelet Evrony, of the same law firm.
3     ADAM MATZGER, Ph.D.,
4  having been first duly sworn, testified as follows:
5     EXAMINATION
6  BY MR. MILLER:
7  Q.  Good morning, sir. Can you state your
8  name and address for the record, please.
9  A.  Sure. Adam Matzger, and my address is
10 2240 Belmont Road in Ann Arbor, Michigan.
11 Q.  Okay. You are aware that you're here to
12 testify in a litigation between a group of entities,
13 I'm going to call them "Pfizer" or "Plaintiffs," and
14 Defendant Cipla Limited, correct?
15 A.  Correct.
16 Q.  Okay. And despite the fact that there
17 are numerous plaintiffs -- numerous? -- several
18 plaintiffs, Pfizer, FoldRX, PRISM, Wyeth, and
19 Scripps, I'm just going to call them "Pfizer" or
20 "Plaintiff." Okay?
21 A.  Yeah, that's fine.
22 Q.  You've been deposed before, correct?

Page 8

1  A.  Yes.
2  Q.  So you're somewhat familiar.
3     I'm going to ask you to make sure all your
4  answers are audible, not "mm-hmm," "huh-uhs"; "yes"
5  or "noes" and that kind of thing. Is that okay?
6  A.  Yes.
7  Q.  You've been retained by Plaintiffs to
8  offer opinions regarding the alleged infringement
9  by Cipla of Plaintiffs' patent, U.S. Patent
10 No. 9,770,441. Is that accurate?
11 A.  Yes.
12 Q.  Okay. And is it fair if we call that the
13 '441 patent for the rest of the deposition today?
14 A.  That would be great.
15 Q.  Okay. Are you aware that there are other
16 defendants in this litigation?
17 A.  I'm -- I'm aware of that, yes.
18 Q.  Okay. And those other defendants are
19 entities named Dexcel, Aurobindo, and Hikma. Is that
20 accurate?
21 A.  I'm not sure who all the defendants are.
22 Q.  Okay. Are you familiar with Hikma as a

Page 9

1  defendant in this litigation?
2  A.  Yes, I am.
3  Q.  And they used to -- they acquired an ANDA
4  from a company called Zenara. Are you familiar with
5  that fact?
6  A.  I am.
7  Q.  Okay. I'm going to refer, regardless of
8  timing or any questions that may touch on them, to
9  Hikma and Zenara as "Hikma," okay?
10 A.  Sounds good.
11 Q.  Okay. You have also been retained by
12 plaintiffs in this case to offer opinions regarding
13 alleged infringement by the Hikma entities, correct?
14 A.  Yes.
15 Q.  Okay. A little bit more terminology for
16 this case. I think sometimes we see a technology or
17 an investigative technology called X-ray powder
18 diffraction referred to as "XRPD" or "PXRD"
19 interchangeably. Can we agree that those are the
20 same thing?
21 A.  Yes. That's how I use it as well.
22 Q.  Okay. I'm going to hand you what will be

Case 1:23-cv-00879-GBW-CJB   Document 278-9   Filed 01/26/26   Page 5 of 7 PageID #: 2600

12/17/2025 — Pfizer Inc. et al. vs Dexcel Pharma Tech. Limited, et al. — Adam Matzger, Ph.D.
Confidential

### Page 118

1  ten minutes plus three consecutive slow scans of
2  about six hours, during which the API had not been
3  returned to the fridge or thrown out. It was all
4  exposed during that time.
5      A.   All of the API?
6      Q.   The API in the sample holder was --
7      A.   Yes.
8      Q.   -- exposed for that consecutive 18 hours
9  plus?
10     A.   The small amount of sample in the sample
11 holder, yes.
12     Q.   Okay. And you said you threw that out
13 after the third slow scan of 146-8-1 was conducted?
14     A.   Yes.
15     Q.   And I assume you followed the same process
16 the next day on March 28, 2024, for the sample
17 1467-8-2?
18     A.   Correct.
19     Q.   Okay. How -- did you intentionally put
20 breaks into the -- the period between the slow scans,
21 or were they conducted, you ran the 6 hours and
22 immediately jumped back and ran the 6-hour scan; do

### Page 119

1  you recall?
2      A.   No intentional breaks.
3      Q.   No intentional breaks. Okay.
4           So each sample that was that was subjected
5  to XRPD was subject to 18-plus hours of consecutive
6  radiation; is that right?
7      A.   Again, you're -- the sample itself at the
8  end of everything, yes.
9      Q.   Okay.
10     A.   But for an individual collection, that's
11 not correct.
12     Q.   Okay. When you say "individual
13 collection," you mean the fast scan, slow scan, one
14 slow scan, two slow scan, three?
15     A.   Correct.
16     Q.   Okay. Did you monitor the temperature
17 that the API reached during scanning?
18     A.   No.
19     Q.   Did you check at any point between fast
20 scan, slow scan or between slow scan and slow scan?
21     A.   No. This instrument does not heat the
22 sample.

### Page 120

1      Q.   Okay. Let's go to Paragraph, again, 174
2  of your Opening Report where we talked about the
3  Raman spectroscopy. That's, again, at Page 71.
4           At the end of that paragraph, you say that
5  you "calibrated the instrument using an internal
6  silicon standard before each day's collection."
7           Do you see that?
8      A.   Yes.
9      Q.   Is the data preserved in any way from that
10 calibration?
11     A.   I don't make -- take any measures to
12 preserve the data.
13     Q.   Okay. So you didn't give any of that data
14 to Pfizer's counsel in this case?
15     A.   Honestly, I don't even know how to find it
16 if it's there. I don't make an effort to save that
17 data.
18     Q.   Okay. At any point in conducting your
19 Raman analysis, did you use -- perform a control
20 experiment with any known infringing form of
21 tafamidis like Form 1, pure Form 1?
22     A.   No.

### Page 121

1      Q.   Did you perform any control experiments
2  using a known noninfringing form of tafamidis like
3  Form 6, for example?
4      A.   Yeah, again, so you're using the term
5  "control experiment." What I would say is I didn't
6  analyze any of those things. None of those things
7  would be controls. They would just be samples.
8      Q.   Well, you didn't analyze any of those
9  samples then?
10     A.   Correct.
11     Q.   Did you analyze any placebo of Cipla's
12 capsule fill without the API in it? Intentionally
13 separate from actually using Cipla's capsule, I think
14 is where you were going with that.
15     A.   Yeah, I mean, so effectively, yes, by
16 focusing in parts where there was no API, but I did
17 not use a placebo capsule itself.
18     Q.   You could have made one and tested that
19 yourself if you wanted to?
20          MR. MANDERNACH: Object to form.
21          THE WITNESS: There would be no reason to
22 do that.

Case 1:23-cv-00879-GBW-CJB   Document 278-9   Filed 01/26/26   Page 6 of 7 PageID #: 2601

12/17/2025   Pfizer Inc. et al. vs Dexcel Pharma Tech. Limited, et al.   Adam Matzger, Ph.D.
Confidential

**Page 134**

1  BY MR. MILLER:
2   Q.   -- section.
3   A.   I -- let's see. I'm trying to understand
4  their use of capitalization here.
5        Oh, in the "VALIDATION AND" -- oh, okay,
6  so that's not performance. I thought we were talking
7  about, let's see, "QUALIFICATION OF RAMAN
8  SPECTROMETERS."
9   Q.   And then there's three subsections,
10 "Installation Qualification," "Operational
11 Qualification," and "Performance Qualification," if
12 you look at that Table of Contents at the top.
13  A.   Right. But you want to -- so you're out
14 of those and into the "VALIDATION AND VERIFICATION"
15 part?
16  Q.   Right.
17  A.   Okay.
18  Q.   And the language you -- you identified as
19 saying that it's application and user dependent
20 specifically says, on the first page, first sentence,
21 under "Operational Qualification. The requirements
22 for OQ are application and user dependent."

**Page 135**

1        Right?
2   A.   Yeah, I mean, I can look through this in
3  more detail if you'd like.
4   Q.   Well, you cited it. I'm just asking: Is
5  it -- is it incorrect to say, as it does, that --
6  that validation must be perform -- validation results
7  must be included as part of the respective analytical
8  test procedure?
9        MR. MANDERNACH: Object to form.
10       THE WITNESS: It may or may not be
11 required to meet the USP guidance. I would say it is
12 very rarely done. I mean, I would hazard to say
13 it's -- it's never been done in this way in the Raman
14 core facility at the University of Michigan.
15 BY MR. MILLER:
16  Q.   Okay. Now, just for clarification. The
17 calibration is discussed in "Operational" -- in the
18 Operation Qualification section, right? That's where
19 they are discussing wavelength calibration of the
20 type that you mention in your reports?
21  A.   I believe so.
22  Q.   All right. And, just based on the

**Page 136**

1  headers, it's fair to say that USP treats calibration
2  and validation as different things, right?
3        MR. MANDERNACH: Object to form.
4        THE WITNESS: So you can look at
5  verification as running the silicon standard that
6  you just calibrated on and making sure it's at
7  520.5 degrees.
8  BY MR. MILLER:
9   Q.   Okay.
10  A.   There's no point in doing that since
11 that's what the calibration -- calibration procedure
12 does is set it to 520.5. That's what I was trying to
13 convey in my answer.
14  Q.   Okay. Understood.
15       And, again, according to the language of
16 this USP section that you cited, the validation
17 results must be included as part of the respective
18 analytical test procedures. So were we to have those
19 results, we could review them. We can't do so
20 because you did not include them as part of your
21 analytical test procedure, right?
22       MR. MANDERNACH: Object to form.

**Page 137**

1        THE WITNESS: And, as I said, I don't see
2  that done.
3  BY MR. MILLER:
4   Q.   And you didn't do it, right?
5        MR. MANDERNACH: Object to form.
6        THE WITNESS: I did not -- beyond the
7  calibration and how that relates to verification, I
8  did not do additional testing.
9  BY MR. MILLER:
10  Q.   Okay. Now, going back to your Reply,
11 Paragraph 166. Let me know when you're there. I
12 think it's the next page from where we just were.
13  A.   Yes.
14  Q.   You say, "Dr. Spingarn also cites a manual
15 mentioning validation ..." It's for a different
16 instrument, you observe. And you say, "The
17 instrument I used - the inVia Qontor model - does not
18 have such a built-in feature because it is not
19 required when the instrument is calibrated with an
20 internal calibration standard as mine is and
21 calibrated daily."
22       So I have a couple of questions about that

Page 282

A. So it's not that precise where I'm putting the initial peak.
Q. Okay. Did you record all of those various attempted deconvolutions anywhere?
A. No.
Q. So you only relied on a selection of your attempted deconvolutions in -- in formulating the opinions in your Opening Report, correct?
A. So they -- they converged on the same result, and so I've provided models for what those look like in some cases in response to comments by Dr. Spingarn, I went back and, you know, looked at things again; and so I have more than one simulation reported in those cases. But, you know, I've shown the fit, and I think the fit is good, that I've modeled the data well.
Q. Okay. Now, looking at your Reply, Paragraph 176, runs from 81 to 88, pages. Oh, excuse me, this is in your Opening Report.
A. Oh, Opening. 176 still?
Q. Yeah.
A. Okay.

Page 283

All right.
Q. So you -- we talked about the -- beginning, "I took the following steps" language on 72, on Page 72 of that paragraph.
A. Right.
Q. Couple lines down from that, you state, "I next indicated all potential peak positions based on a visual inspection, i.e., I approximately marked what appeared to be the true positions of overlapping peaks."
I think that's -- is that what you're referring to when you said that the -- looking for your exact language -- your deconvolution started to center on the same data? I'm not using your exact language. I can't find it in the transcript right now.
A. Oh, yeah, I just mean --
Q. It's --
A. -- when I've tried this different times, clicking --
Q. Clicking --
A. -- in other places --

Page 284

Q. Okay.
A. -- it converged to the same result.
Q. Converged to the same result. Okay.
Okay. Now, how do you know when your mathematical curve is a good fit for the actual data?
A. The best way to look at that is, to me, is to compare the spectrum, that's the red thing, to the addition, which is, I think in my report, maybe dark green, and so that's the summation of all the peaks that have been chosen in the model; and you want that to be in good agreement, not to have gaps or, you know, differences between those.
Q. So there is a visual aspect to confirming that the summation is a good fit, and there's also the chi-square value; is that fair to say?
A. Yeah, I think the more critical one is the visual fit, especially in the region of interest.
Q. Okay. So could you theoretically have a poor chi-square value and a good visual fit to the region of interest?
A. To the region of interest, certainly.
Q. Okay. And, just for the record, a low chi

Page 285

square is kind of like what we talked about earlier, a low chi-square value is a good thing, a high one is a bad thing, as far as mathematical fit?
A. Right, in terms of that fit overall. But you could have a pretty good chi-squared and still have a poor fit in a particular region of interest, which is why you need to look at that red-dark green overlay.
Q. Okay. So even if you have a good mathematical fit, i.e., a low chi-square value -- strike that.
The chi-square value represents the mathematical fit of the deconvoluted curves to the actual experimental data, correct?
MR. MANDERNACH: Object to form.
THE WITNESS: Yeah, essentially.
BY MR. MILLER:
Q. Okay. And, visually speaking, you could have a very good low chi-square value with a poor fit in the particular region you're looking for, I think you said, right?
A. It can happen, yes.