IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PFIZER INC.,                                          )
FOLDRX PHARMACEUTICALS, LLC,                         )
PF PRISM IMB B.V., WYETH LLC, and                    )
THE SCRIPPS RESEARCH INSTITUTE,                      )
                                                     )
              Plaintiffs,                            )
                                                     )
       v.                                            )     C.A. No. 23-879 (GBW) (CJB)
                                                     )     CONSOLIDATED
DEXCEL PHARMA TECHNOLOGIES                           )
LIMITED, et al.,                                     )     ███████████████
                                                     )
              Defendants.                            )     ███████████████
                                                     )
                                                           REDACTED - PUBLIC VERSION

**PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS HIKMA
PHARMACEUTICALS USA INC.'S AND CIPLA LIMITED'S MOTION TO EXCLUDE
CERTAIN INFRINGEMENT TESTIMONY OF ADAM MATZGER, PH.D.**

                                           MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                                           Jeremy A. Tigan (#5239)
                                           Megan E. Dellinger (#5739)
                                           1201 North Market Street
OF COUNSEL:                                P.O. Box 1347
                                           Wilmington, DE  19899
Thomas H.L. Selby                          (302) 658-9200
Stanley E. Fisher                          jtigan@morrisnichols.com
Christopher J. Mandernach                  mdellinger@morrisnichols.com
Andrew L. Hoffman
Ayelet Evrony                              *Attorneys for Plaintiffs*
Rhochelle Krawetz
Daniel P. Schneider
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC  20024
(202) 434-5000

January 29, 2026

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ...................................................................................................... 1

II.     FACTUAL BACKGROUND ..................................................................................... 2

        A.      The Asserted Claims Require the Presence of Claimed PXRD or
                Raman Peaks ................................................................................................. 2

        B.      Dr. Matzger Has Decades of Significant Raman Experience ................................. 3

        C.      Dr. Matzger's Raman Testing and Defendants' Internal Documents
                Show ███████████ ...................................................................................... 3

                1.      Dr. Matzger's Raman Mapping Analysis Shows ████████████ ........... 5

                2.      Dr. Matzger's Raman Point Spectra and Curve Fitting Analysis
                        Show ██████████ ........................................................................... 7

III.    LEGAL STANDARD ................................................................................................ 11

IV.     ARGUMENT ............................................................................................................ 12

        A.      Dr. Matzger's Infringement Opinions That Rely on Curve Fitting Are
                Reliable and Admissible ................................................................................. 12

        B.      Dr. Matzger's Infringement Opinions That Rely on Raman Mapping
                Are Reliable and Admissible ............................................................................ 17

V.      CONCLUSION ......................................................................................................... 20

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*10x Genomics, Inc. v. Parse Biosciences, Inc.*,
   2025 WL 572788 (D. Del. Feb. 21, 2025) ..................................................................... 13

*Biogen Inc. v. Sandoz Inc.*,
   2025 WL 1000825 (D. Del. Apr. 3, 2025) .................................................................... 11

*Boston Scientific Corp. v. Cordis Corp.*,
   777 F. Supp. 2d 783 (D. Del. 2011) ............................................................................ 16

*Coffey v. Dowley Mfg., Inc.*,
   187 F. Supp. 2d 958 (M.D. Tenn. 2002) ...................................................................... 15

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ....................................................................................................... 11

*In re Novartis Pharms. Corp. v. MSN Pharms. Inc.*,
   2024 WL 4723274 (D. Del. Nov. 8, 2024) ............................................................. 14, 20

*In re Paoli R.R. Yard PCB Litig.*,
   35 F.3d 717 (3d Cir. 1994) ........................................................................................ 13, 17

*In re TMI Litig.*,
   193 F.3d 613 (3d Cir. 1999) ......................................................................................... 19

*Kowa Co., Ltd. v. Amneal Pharms., LLC*,
   2017 WL 10667089 (S.D.N.Y. Sept. 19, 2017) ............................................................ 2

*Minerva Surgical, Inc. v. Hologic, Inc.*,
   2021 WL 3048447 (D. Del. July 20, 2021) .................................................................. 11

*Par Pharm., Inc. v. Hospira, Inc.*,
   2019 WL 2396748 (D. Del. June 6, 2019) ................................................................... 11

*Pineda v. Ford Motor Co.*,
   520 F.3d 237 (3d Cir. 2008) ......................................................................................... 11

*Schering Corp. v. Apotex Inc.*,
   2012 WL 2263292 (D.N.J. June 15, 2012) .................................................................. 17

*SmithKline Beecham Corp. v. Apotex Corp.*,
  403 F.3d 1331 (Fed. Cir. 2005)..................................................................................... 2

*Stecyk v. Bell Helicopter Textron, Inc.*,
  295 F.3d 408 (3d Cir. 2002)........................................................................................ 15

*United States v. Bonds*,
  12 F.3d 540 (6th Cir. 1993) ........................................................................................ 16

*United States v. Morrow*,
  374 F. Supp. 2d 51 (D.D.C. 2005).............................................................................. 19

*United States v. Rouse*,
  2024 WL 2044630 (4th Cir. May 8, 2024) ................................................................. 20

TABLE OF EXHIBITS

| Exhibit No. | Description | Short Cite |
|---|---|---|
| 1 | U.S. Patent No. 9,770,441 | '441 patent |
| 2 | Corrected Reply Report of Dr. Adam J. Matzger, Ph.D. (excerpt) directed at Cipla, dated December 19, 2025 | Matzger Cipla Reply |
| 3 | Opening Report of Dr. Adam J. Matzger, Ph.D. (excerpt) directed at Cipla, dated June 27, 2025 | Matzger Cipla Rep. |
| 4 | December 5, 2025 Deposition Transcript of Jonathan Steed, Ph.D. (excerpt) | Steed Tr. |
| 5 | November 20, 2025 Deposition Transcript of Neil Spingarn, Ph.D. (excerpt) | Spingarn Tr. |
| 6 | Opening Report of Dr. Adam J. Matzger, Ph.D. (excerpt) directed at Hikma, dated June 27, 2025 | Matzger Hikma Rep. |
| 7 | Reply Report of Dr. Adam J. Matzger, Ph.D. (excerpt) directed at Hikma, dated November 7, 2025 | Matzger Hikma Reply |
| 8 | December 17, 2025 Deposition Transcript of Adam Matzger, Ph.D. (excerpt) | Matzger Tr. |
| 9 | Exhibit 9 from the Deposition of Neil Spingarn, Ph.D. | Spingarn Dep. Ex. 9 |
| 10 | Exhibit 35 from the Deposition of Jonathan Steed, Ph.D. | Steed Dep. Ex. 35 |
| 11 | Brigitte Wopenka et al., *The Tendon-to-Bone Transition of the Rotator Cuff: A Preliminary Raman Spectroscopic Study Documenting the Gradual Mineralization Across the Insertion in Rat Tissue Samples*, 62(12) APPLIED SPECTROSCOPY 1285 (2008) | Wopenka 2008 |
| 12 | John J. Freeman et al., *Characterization of Natural Feldspars by Raman Spectroscopy for Future Planetary Exploration*, 46 CANADIAN MINEROLOGIST 1477 (2008) | Freeman 2008 |
| 13 | N. Shimodaira & A. Masui, *Raman Spectroscopic Investigations of Activated Carbon Materials*, 92 J. OF APPLIED PHYSICS 902 (2002) | Shimodaira 2002 |
| 14 | M.V.P. Chowdary et al., *Biochemical Correlation of Raman Spectra of Normal, Benign and Malignant Breast Tissues: A Spectral Deconvolution Study*, 91(7) BIOPOLYMERS 539 (2009) | Chowdary 2009 |
| 15 | David Tuschel, *Peak Shape and Closely Spaced Peak Convolution in Raman Spectra*, 36(9) SPECTROSCOPY 2 (2021) | Tuschel 2021 |
| 16 | WiRE 4.0, *TM012 – Data processing and simple analysis*, RENISHAW | Renishaw (PFZ04170274) |
| 17 | Diana Y. Siberio-Pérez et al., *Raman Spectroscopic Investigation of CH4 and N2 Adsorption in Metal-Organic Frameworks*, 19 CHEMISTRY OF MATERIALS 3681 (2007) | Siberio-Perez 2007 |

| Exhibit No. | Description | Short Cite |
|---|---|---|
| 18 | Hochul Woo & Adam J. Matzger, *Competitive Guest Binding in a Metal - Organic Framework with Coordinatively Unsaturated Metals*, 7 ACS MATERIALS LETTERS 450 (2025) | Woo 2025 |
| 19 | Mark J. Henson & Lin Zhang, *Drug Characterization in Low Dosage Pharmaceutical Tablets Using Raman Microscopic Mapping*, 60(11) APPLIED SPECTROSCOPY 1247 (2006) | Henson 2006 |

## I.    INTRODUCTION

This is a Hatch-Waxman case, involving a patent covering Pfizer's lifesaving and blockbuster medicine Vyndamax®, the active ingredient of which is tafamidis.  A bench trial is scheduled for April 27–May 1.  Hikma and Cipla (collectively, "Defendants") contest infringement of U.S. Patent No. 9,770,441 ("the '441 patent"), which claims a crystalline form (or "polymorph") of tafamidis having certain powder X-ray diffraction ("PXRD") or Raman peaks.  Dr. Adam Matzger, an analytical chemist with decades of PXRD and Raman experience, tested Hikma's and Cipla's ANDA products.  That testing confirms what is apparent from Defendants' own documents:  Defendants' ANDA products contain a ███████████████████████ ████ and therefore infringe the Asserted Claims of the '441 patent.

Dr. Matzger's analysis is devastating to Defendants' non-infringement position, including because none of Defendants' experts did their own testing to challenge Dr. Matzger's opinions.  Defendants thus launch a targeted attack on limited aspects of Dr. Matzger's Raman analysis.  Specifically, Defendants argue that (1) Dr. Matzger's curve fitting opinions applied to Raman point spectra are subjective and unmoored from reliable science, and (2) Dr. Matzger failed to use ██████████ and pure tafamidis reference standards to validate his Raman mapping results.  Br. at 1.  Both criticisms lack merit.  Dr. Matzger's curve fitting methodology is grounded in peer-reviewed literature and accepted practice, and reference standards are not necessary to identify the claimed peaks in a sample that ████████████████████████████ of tafamidis, contrary to the say-so of Hikma's expert (the totality of Defendants' evidence).  At most, Defendants highlight points of disagreement between experts that are the proper subject of contradictory testimony and/or cross-examination.  There is no basis to exclude any of Dr. Matzger's opinions.

## II.    FACTUAL BACKGROUND

### A.    The Asserted Claims Require the Presence of Claimed PXRD or Raman Peaks

Tafamidis—the active pharmaceutical ingredient ("API") in the drug product Vyndamax®—is a small-molecule compound having multiple crystalline forms, known as polymorphs. These polymorphs can be identified using analytical methods, such as PXRD and Raman spectroscopy. Ex. 1 ('441 patent) 2:7–15, 10:23–45.

As relevant here, the Asserted Claims of the '441 patent are directed to "a crystalline form of [tafamidis], wherein said crystalline form" has specific PXRD or Raman peaks. Ex. 1 ('441 patent) claims. Claim 1, for example, recites a crystalline form of tafamidis with "a powder X-ray diffraction pattern comprising a peak at a diffraction angle (2θ) of 28.6±0.2" and/or "a Raman spectrum comprising a Raman shift peak (cm-1) at 1292±2." *Id.* █████████████
███████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████  ████

The '441 patent "contemplates that [polymorphic forms of tafamidis] can exist in the presence of … any other of the solid forms … or mixtures thereof," including at levels of "less than 1% by weight." *Id.* at 4:10–29; *see also id.* at 14:58–15:10. There is no dispute that Defendants' ANDA products contain ████████████████ of tafamidis. Thus, the salient infringement question is whether any amount of Defendants' crystalline tafamidis has the Raman or PXRD peaks recited in the Asserted Claims. *See SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1341 (Fed. Cir. 2005) (small amounts of infringing form sufficient for infringement); *Kowa Co., Ltd. v. Amneal Pharms., LLC*, 2017 WL 10667089, at *8 (S.D.N.Y. Sept. 19, 2017).

### B.    Dr. Matzger Has Decades of Significant Raman Experience

Defendants' *Daubert* motion is limited to specific aspects of Dr. Adam Matzger's Raman testing of Defendants' API and ANDA products.  Dr. Matzger is a globally recognized expert in Raman spectroscopy.[1]  He frequently uses Raman techniques himself and publishes peer-reviewed papers on the same topics, including as recently as 2025.  Ex. 2 (Matzger Cipla Reply) ¶¶ 149, 152 n.163.  Dr. Matzger directs the Raman Spectroscopy Core facility at the University of Michigan, *id.* ¶ 149, and is President and CEO of ChemXLerate LLC—a company that has analyzed hundreds of pharmaceutical samples using Raman spectroscopy methods, Ex. 3 (Matzger Cipla Rep.) ¶ 3.

In contrast, the lead expert in Defendants' brief, Dr. Steed, "tend[s] not to use Raman a great deal in [his] research," "do[es]n't find Raman all that useful," and is admittedly "not a specialist" in Raman spectroscopy.  Ex. 4 (Steed Tr.) at 160:2–9, 164:10–18, 165:8–12; *see also id.* at 162:18–163:3 ("I don't recall using Raman mapping in my research because it's not the kind of research that I do.").  Meanwhile, Cipla's expert, Dr. Spingarn, has published exactly one paper involving Raman testing, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Neither expert conducted any Raman testing in this case.

### C.    Dr. Matzger's Raman Testing and Defendants' Internal Documents Show ▮▮▮▮▮▮▮▮▮▮

Dr. Matzger's testing established that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Ex. 3 (Matzger Cipla Rep.) ¶¶ 192, 208; Ex. 6 (Matzger Hikma Rep.) ¶¶ 242, 271.  His testing also confirmed ▮▮

▮▮▮▮▮▮▮ ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



---

[1] Dr. Matzger's PXRD expertise is similarly compelling; his opinions on PXRD are not at issue.

███████████████████████████████████████████████████████

████████████████  ████████████████████████

Dr. Matzger employed two common and well-recognized Raman spectroscopy techniques to determine the peaks present in Defendants' crystalline tafamidis: Raman mapping and Raman point spectra. *E.g.*, Ex. 2 (Matzger Cipla Reply) ¶ 139. Cipla's expert, Dr. Spingarn, concedes that both techniques were known as of the '441 patent's priority date. Ex. 5 (Spingarn Tr.) at 90:3–8. Both techniques use the same foundational technology—a laser directed at the product sample to identify relevant crystalline forms—though they differ in one important respect. Raman mapping collects tens of thousands of spectra from discrete (and very specific) regions of the sample, ████████████████████████████████████████

████████████████████  Raman point spectra, on the other hand, involves analyzing a dense area of particles and generating a composite spectra of peaks from all crystalline forms present in the area. *Id.* In some spectra, t████████████████████████████████████████

████████████████████ The difference between these two techniques is illustrated below.[2]

---

[2] *E.g.*, Ex. 7 (Matzger Hikma Reply) ¶ 104.



1.    **Dr. Matzger's Raman Mapping Analysis Shows** ███████████

Raman mapping can be used to find relatively isolated instances of a minor polymorphic form, the peaks of which would otherwise be buried or dwarfed by the majority form. Because Raman mapping facilitates isolation of a minor polymorph in a mixture, the POSA generally can rely on automatic peak picking software to identify peak positions without concern of overlapping peaks from some other form. *See* Ex. 2 (Matzger Cipla Reply) ¶¶ 127, 129. With automatic peak picking, software utilizes an algorithm to automatically pick the locations of peaks. *Id.* ¶ 130. Defendants acknowledge that "the use of automated peak-picking software is routine for a person of ordinary skill in the art to determine the presence of peaks in an unknown sample." Br. at 16.

As Defendants also note, automatic peak picking was utilized in the '441 patent to pick the peaks of the pure polymorphic forms Pfizer discovered.  Br. at 2.

Automatic peak picking has several benefits, one being that the peak picking software automatically distinguishes peaks from noise (random small fluctuations in a spectrum that are not indicative of the properties of the tested polymorph).  *See* Ex. 8 (Matzger Tr.) at 164:2–11.  The peak picking algorithm "inherently account[s] for noise and exclude[s] it from being misclassified as a peak."  Ex. 2 (Matzger Cipla Reply) ¶ 226.

Dr. Matzger used automatic peak picking to identify the location of peaks in the Raman maps generated from his testing, and when he did, the peak picking software identified the Raman peaks ███████████  ████   *See* Ex. 9 (Spingarn Dep. Ex. 9); Ex. 10 (Steed Dep. Ex. 35).  An exemplary Raman map spectra is reproduced below. ██████████████████████████



This map, and the others like it, ████████████████████████████████████

████████████████████████████. Ex. 10 (Steed Dep. Ex. 35); Ex. 9 (Spingarn Dep.

Ex. 9). Defendants conducted no counter-testing or counter-analysis of the Raman mapping to show otherwise.

Guided by the '441 patent, Dr. Matzger did not need to compare his Raman data against external reference standards to conclude that the peaks he observed were attributable to crystalline tafamidis (which indisputably is found in Defendants' ANDA products). Dr. Matzger analyzed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and found ▮▮▮ the above peaks. Ex. 2 (Matzger Cipla Reply) ¶ 171. Further, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, so it is impossible for the peaks in the API Raman maps ▮▮▮▮▮▮▮▮. Nor can one attribute the automatically picked ▮▮▮▮ peaks to a calibration error. Dr. Matzger calibrated his Raman instrument "before each day's collection," which "directly ensured the accuracy of the instrument by aligning its wavenumber scale to known, traceable peaks." *Id.* ¶ 165. This calibration procedure is consistent with guidelines published by the United States Pharmacopeia, the manual for Dr. Matzger's Raman machine, and validation procedures reported in prior art articles. *Id.*

## 2.    Dr. Matzger's Raman Point Spectra and Curve Fitting Analysis Show ▮▮▮▮▮▮▮

In addition to Raman mapping, Dr. Matzger identified ▮▮▮▮▮▮▮ ▮▮▮▮ ▮▮▮ ▮▮▮▮▮▮▮. The peaks were found using a combination of automatic peak picking and deconvolution—a well-known technique also referred to as curve-fitting. While automatic peak picking is valuable, it can fall short of identifying the right location of overlapping peaks, including in situations where minority form peaks are overwhelmed by nearby peaks from a majority form. Ex. 2 (Matzger Cipla Reply) ¶¶ 131–32. In a curve-fitting procedure, the POSA first suggests potential peak locations based on where signal rises above noise. *Id.* ¶ 133. These inputs are based on an objective visual analysis performed by the POSA. Software then simulates

different peaks to define a spectrum that most closely aligns (or fits) with the experimentally observed spectrum. *Id.* An example of an area that Dr. Matzger identified as a good candidate for deconvolution is below.



*Id.* ¶ 194. Dr. Matzger explains: ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

Deconvolution is widely accepted and routinely used for determining the precise peak locations of overlapping peaks. ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ as do the '441 patent, peer-reviewed publications, and Raman instrument user manuals. *See, e.g.*, Ex. 1 ('441 patent) at 14:58-15:10, 15:27–35; Ex. 11 (Wopenka 2008) at 1287; Ex. 12 (Freeman 2008) at 1491; Ex. 13 (Shimodaira 2002) at 902, 909; Ex. 14 (Chowdary 2009) at 540; Ex. 15 (Tuschel 2021) at 2; Ex. 16 (Renishaw (PFZ04170274)) at -285-286.

While automatic peak picking software ████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████    ████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████ As is
customary in such situations, Dr. Matzger performed deconvolution in accordance with the
procedure outlined in his Raman software manual and described in the literature by ████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████

The accuracy and reliability of peaks obtained via deconvolution can be assessed visually
for fit and mathematically using so-called chi-square ("$\chi^2$") values.  Ex. 7 (Matzger Hikma Reply)
¶ 170.  A key component of the visual inspection is comparing the experimental spectrum (*i.e.*, the
point spectrum) with the calculated spectrum (*i.e.*, the spectrum including the peak positions
identified via deconvolution).  *Id.* ¶ 171.  The closer the calculated spectrum matches the

experimental spectrum, the more accurate and reliable the position of the deconvoluted peaks.  A comparison of Dr. Matzger's deconvolution and Dr. Steed's is illustrative.[3]



In the table above, the experimental spectrum is in red and the calculated spectrum is in dark green. *Id.* ¶¶ 186–87.  The purple arrows indicate where Dr. Steed's calculated spectrum deviated from the experimental spectrum, ███████████████████████████████ *Id.* ¶ 186.

Dr. Matzger's spectra, on the other hand, are nearly identical, █████████████ *Id.* ¶ 187.

      Fit can also be assessed ███ █ ████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████ █ ██████████████████████████

███████████████████████ █ ███████████████████████

████████████████████████

      To assess the accuracy of his curve fitting, Dr. Matzger also compared the fit of a calculated spectrum ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████ █ ████████████████████████████████

---

[3] Ex. 7 (Matzger Hikma Reply) ¶¶ 186–87.  Because deconvolution is a mathematical procedure, Dr. Steed was able to perform his own deconvolution analysis on the Raman spectra Dr. Matzger produced.  However, Dr. Steed did no independent testing of any product.

███████ █ ████████████████████████    ██ ████

████████████████████████████████████████

████████████████████████. As Dr. Matzger explains, these objective metrics used to test the validity of the results should not be viewed in isolation; each should be considered together to verify the resulting spectra. *See, e.g.*, Ex. 7 (Matzger Hikma Reply) ¶ 186.

## III.    LEGAL STANDARD

The admissibility of expert testimony is analyzed under Rule 702, which requires that proposed testimony be both relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). Rule 702 embraces a "liberal policy of admissibility" with a "strong preference for admitting any evidence which has the potential for assisting the trier of fact." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (cleaned up). "Vigorous cross-examination [and] presentation of contrary evidence"—rather than exclusion—"are the traditional and appropriate means of attacking" expert testimony. *Daubert*, 509 U.S. at 596.

Exclusion is a particularly inapt tool in a bench trial, where "evidence should be admitted and then sifted when the district court makes its findings of fact and conclusions of law." *Par Pharm., Inc. v. Hospira, Inc.*, 2019 WL 2396748 at *2 (D. Del. June 6, 2019). As this Court has explained: "Safeguards such as those provided for in Rules 701 and 702 are largely irrelevant in the context of a bench trial because it [is] presumed that the bench judge will not rely on inadmissible evidence." *Biogen Inc. v. Sandoz Inc.*, 2025 WL 1000825, at *2 (D. Del. Apr. 3, 2025) (cleaned up). Further, when an expert's "methodology is sound, and the evidence relied upon sufficiently relate[s] to the case at hand, disputes about the degree of relevance or accuracy … may go to the testimony's weight, but not its admissibility." *Minerva Surgical, Inc. v. Hologic, Inc.*, 2021 WL 3048447, at *6 (D. Del. July 20, 2021) (cleaned up).

## IV.     ARGUMENT

### A.     Dr. Matzger's Infringement Opinions That Rely on Curve Fitting Are Reliable and Admissible

Defendants attempt to paint Dr. Matzger's use and application of curve fitting as arbitrary science based on subjective inputs and requiring validation by external evidence.  Br. at 9–18.  But Defendants muster only their own experts' say-so and cherry-picked statements while omitting critical facts.   Peer-reviewed literature, the Raman software manual, and admissions from Defendants' own experts confirm curve fitting is an accepted and reliable technique that Dr. Matzger properly applied in this context—validated by the Raman map data. ███████████████

████████████████████████████████████████████████████

███████████████████████████████ In all events, Defendants' critiques fall far below what is necessary to justify exclusion of Dr. Matzger's opinions.

The party's experts all agree that curve fitting is an established, well-accepted scientific technique.  As Hikma's own expert explains, "[c]urve fitting and fitting processes generally are fundamental tool[s] throughout the chemical sciences."  Ex. 4 (Steed Tr.) 164:2–9.  Automatic peak-picking, while highly useful, does not work in all situations:  where peaks overlap, a large peak can obscure adjacent peaks' positions. *Supra* at 7–8.  In that context, peer-reviewed literature recognizes the utility of curve fitting, which uses mathematical analysis that goes beyond mere visual observation.  *See, e.g.*, Ex. 11 (Wopenka 2008) at 1287 ("Even though this band is small and only appears as a shoulder on [an adjacent peak] in the raw spectrum … , it can be resolved unambiguously via peak deconvolution … .").  The '441 patent likewise explicitly contemplates peak convolution (*i.e.*, overlapping peaks) and states analytical parameters "may require additional optimization to enable for the detection of the[] characteristic peaks."  Ex. 1 ('441 patent) at 15:27–35; *id.* at 14:65–15:1 ("For example, a solid form that comprises two polymorphs will have a

powder X-ray diffraction pattern that is a convolution of the two X-ray diffraction patterns … .").
The POSA thus would understand that, when a visual inspection of a Raman spectrum provides
evidence of peak overlap, curve fitting is appropriate.

Defendants describe curve fitting as though it is divorced from reality and wholly
theoretical. Not so. As applied by Dr. Matzger, the initial step involves a visual identification by
the POSA of areas of potential peak overlap. *See supra* at 9. This initial step is objectively
verifiable by the POSA and consonant with peer-reviewed publications. The selection also is
grounded in Dr. Matzger's extensive experience with both Raman spectroscopy and curve fitting—
experience Dr. Steed admittedly lacks. *See supra* at 3; *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d
717, 742 n.8 (3d Cir. 1994) (considering "the qualifications of the expert witness testifying based
on the methodology"). The basis for Dr. Matzger's initial selection thus can be interrogated at
trial, with specific reference to the objective visual impetus for his initial selection and considering
Dr. Matzger's significant experience making such determinations. *See 10x Genomics, Inc. v.
Parse Biosciences, Inc.*, 2025 WL 572788, at *4 (D. Del. Feb. 21, 2025) (considering "whether
the expert's theory can be challenged in some objective sense" (citation omitted)).

Dr. Matzger's approach is literally by the book: user-based identification of areas of
interest is expressly recognized by the Raman software manual and consistent with peer-reviewed
publications. *See supra* at 9; Ex. 15 (Tuschel 2021) at 2 (noting widespread use of processing
software to analyze Raman spectra because "[t]hose who perform Raman spectroscopy know that
acquiring a Raman spectrum is only the first step"). To curve fit, the manual states a user should
"[u]se the mouse to position the approximate center of the band," and "[t]he algorithm will perform
many iterations until the best fit has been achieved." Ex. 16 (Renishaw (PFZ04170274)) at -285–
86. It is this routinely used and well-accepted algorithm, not the user, that deconvolutes

overlapping peaks and accurately positions them. *See* Ex. 8 (Matzger Tr.) at 273:8–17 (the computer software program "tells you where the peaks are as a result of the deconvolution"). Dr. Matzger also did not blindly accept the software's fit but instead relied on multiple objective qualities of the fit, ███████████ █ █████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████

Defendants rely on their own experts' curve fitting to claim that because they got slightly different results, the technique is unreliable. Br. at 11–14. But those results—based on different inputs and flawed assumptions—only demonstrate the accuracy of Dr. Matzger's findings. For example, Dr. Steed's analysis introduced artifacts that evidence a poor overall fit in the area around ██████. *E.g.*, Ex. 7 (Matzger Hikma Reply) ¶¶ 171, 174. ████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ Dr. Matzger provided a cogent explanation of why his curve fitting—based on acceptable scientific standards, his significant experience, and objective visual evidence, all of which the fact-finder can interrogate—shows infringement. "[S]upposed issues with [an] expert's processes and evaluations … is best determined at trial." *In re Novartis Pharms. Corp. v. MSN Pharms. Inc.*, 2024 WL 4723274, at *3 (D. Del. Nov. 8, 2024).

Defendants also contend that "additional testing is required to validate" Dr. Matzger's findings. Br. at 14. What that additional testing is and why it is required are questions for which

Defendants offer no answers. In any case, Defendants ignore that Dr. Matzger did in fact conduct further analysis that corroborates the Raman peaks identified via curve fitting: the Raman mapping data described above. *Supra* § II.C.1. Defendants cite only a single, non-binding and inapposite case to justify their position. Br. at 14 (citing *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958 (M.D. Tenn. 2002)).[4] Controlling caselaw, in contrast, makes clear that Defendants' criticism of the "methodology and [] underlying assumptions" in Dr. Matzger's curve fitting procedure "goes to the weight given to his testimony, rather than admissibility." *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 391 (3d Cir. 2016). The Federal Rules of Evidence "place[] the burden of exploring the facts and assumptions underlying the testimony of an expert witness on opposing counsel during cross-examination." *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002).

Defendants further argue that deconvolution cannot be used for "the identification of unknown peaks," full stop. Br. at 16. Defendants again rely exclusively on their own experts' testimony for this proposition. *See id.* But this is not a case where the underlying molecule is unknown: Defendants admit their ANDA products ███████████████ ; the only question is whether testing shows the claimed peaks. Regardless, ███████████████████ ████████████████████████████████████████ ████████████████████████████ And "[t]he fact that

_____

[4] In *Coffey*, a products liability case, an expert used a computerized analysis to determine the torque required for a tool to fail. 187 F. Supp. 2d at 962. The expert "guess[ed]," with no basis, as to critical facts regarding plaintiff's use of the tool preceding his injury. *Id.* at 974, 976. More than one of these guesses were proven wrong. *Id.* at 974. Only after such "guesstimations" were proven to have "little grounding in actual physical realities" was the expert's analysis excluded as unreliable. *Id.* at 974, 978. The present circumstances are nothing like *Coffey*. Defendants point to no factual assumption Dr. Matzger made about the samples he tested. Instead, Dr. Matzger's selection of unresolved peaks *was* grounded in actual physical realities—████████████████ ████████████████

experts disagree as to methodologies and conclusions is not grounds for excluding relevant testimony." *Boston Scientific Corp. v. Cordis Corp.*, 777 F. Supp. 2d 783, 794 (D. Del. 2011). Further, even were it somehow in doubt whether Defendants' samples contain crystalline tafamidis, the literature confirms the use of deconvolution to identify peaks in novel samples, belying Defendants' claim that "Dr. Matzger repurposes a technique that is used in the scientific community for a fundamentally different inquiry." Br. at 16; *see, e.g.*, Ex. 13 (Shimodaira 2002) at 902, 909. Disagreement among experts is the purpose of trial, not *Daubert*.

Defendants also raise a specter that curve fitting could "result in theoretical peaks that do not exist in the experimental data," and state Dr. Matzger needed to further "validate" the results of his analysis ████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ Br. at 17–18. But Dr. Matzger recognized this very limitation; ████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████ Defendants' picayune criticisms from witnesses who conducted none of their own testing, and at least one of whom does not even use Raman spectroscopy, "go merely to the weight, not the admissibility, of [Dr. Matzger's] evidence and testimony," as "peer review and publication should be viewed as evidence that the theory and methodology are scientific knowledge capable of being scrutinized and have in fact been scrutinized by the scientific community." *United States v. Bonds*, 12 F.3d 540, 559 (6th Cir. 1993).

The hypothetical pitfalls of curve fitting Defendants identify (but do not contend skewed Dr. Matzger's results) were accounted for in Dr. Matzger's analysis and are capable of external validation. For example, Defendants quote Dr. Matzger's own statement that "it is possible to

create a good fit for almost any spectrum simply by placing a very large number of peaks." Br. at 17 (quoting Ex. 7 (Matzger Hikma Reply) ¶ 172). Recognizing this, Dr. Matzger ensured his deconvolution procedure and the subsequent Raman spectra were (1) grounded in objectively verifiable physical evidence from the initial spectra, (2) cognizant of chi-square metrics, and (3) reflective of a strong physical fit between the calculated and experimental spectra. *Supra* at 9–11. Defendants postulate that there "are various avenues Dr. Matzger could have pursued" to validate his Raman spectra, but they neither identify those "avenues" nor cite anything for support. Br. at 15. Nor did they pursue such avenues on their own. Regardless, Dr. Matzger's Raman mapping data, ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

Defendants' final critique—that Dr. Matzger does not use curve fitting outside the litigation context—is wrong. Dr. Matzger routinely applies curve fitting to identify unknown peaks in Raman spectra and has published articles reflecting that practice. *See, e.g.*, Ex. 17 (Siberio-Pérez 2007) at 3682; Ex. 18 (Woo 2025) at 452; *see Paoli*, 35 F.3d at 742 n.8 (considering "the non-judicial uses to which the method has been put").[5]

## B. Dr. Matzger's Infringement Opinions That Rely on Raman Mapping Are Reliable and Admissible

Defendants offer a thin, two-page critique of Dr. Matzger's use of Raman mapping: because Dr. Matzger "did not use any reference standards" to "validate" the source of the

---

[5] While Defendants attempt to impugn Dr. Matzger's reliability with a stray quotation from an expert in a *different* case, Br. at 18, it does nothing to support Defendants' position in this posture, because Dr. Matzger's use of a "vortexing procedure" in that case is entirely unrelated to the deconvolution procedure employed here and, in any event, was considered *at trial*, not excluded under *Daubert*. *Schering Corp. v. Apotex Inc.*, 2012 WL 2263292, at *4–5 (D.N.J. June 15, 2012).

infringing peaks, those peaks could be from an ███████ or degradant, not the API.  Br. at 18–19.[6]

Neither the facts nor law support Defendants' position or come close to justifying exclusion of

Dr. Matzger's opinions.

Reference standards are unnecessary because Dr. Matzger was not characterizing an

unknown material, among other reasons.  Defendants concede that their ANDA Products include

███████████████████  And the purpose of Dr. Matzger's Raman testing was to identify the peaks

of that ███████ material.  *See* Ex. 7 (Matzger Hikma Reply) ¶ 219.  Peer-reviewed literature

likewise justifies the very approach Dr. Matzger employed (automatic peak-picking) with no

mention of using reference standards.  *See, e.g.*, Ex. 19 (Henson 2006) at 1248–49.

Regardless, Dr. Matzger offered ███████████████████████

████████████████████████████████████████████

████  ████████████████████████████████████████

████████████████████████████████████████████

███████████████  And in the ANDA product Raman maps, ██████████████

██████████████████████████████████████  Ex. 7 (Matzger

Hikma Reply) ¶ 218.  Dr. Matzger also testified: ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[6] Defendants tersely claim that "Dr. Matzger did not follow the Raman spectroscopy method disclosed in the '441 patent."  Br. at 2 n.1.  But Cipla's expert testified that ██████████████ ████████████████████████████████████████████ ███████████████████████████████████

███████████████████████████████████████████████████████████████████

████ Defendants' rejection of these opinions, rooted in the specific composition of the ANDA products and Dr. Matzger's significant experience, is grounds for (if anything) cross-examination, not exclusion. *See In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999) ("The admissibility inquiry [] focuses on principles and methodology, not on the conclusions generated by the principles and methodology," which "is for the trier of fact when the expert is subjected to cross-examination.").

Defendants' argument that Dr. Matzger needed to compare Hikma's and Cipla's drug products against "reference maps of the relevant forms of tafamidis" identified in the '441 patent is equally unavailing. Br. at 19. Had Dr. Matzger done that, Defendants likely would have argued that intentionally exposing his laboratory to a pure form encompassed by the claims contaminated the Hikma and Cipla drug product samples and led to a false-positive. ███████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████     ███████████   ██████████

█████████████████████████████████████████████████████████████████

████, and the "concern under Rule 702 and *Daubert* is the reliability of the scientific methodology at issue, not the reliability of the laboratory performing the test," *United States v. Morrow*, 374 F. Supp. 2d 51, 67 (D.D.C. 2005) (quotation omitted).

In a last ditch effort, Defendants argue that Dr. Matzger did not provide evidence that he validated his Raman instrument. *See* Br. at 20. ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████     ████████████████████████████████████████

19

███████████████████████████████████████████████

████████████████████████████████████████    Dr. Matzger's approach is entirely consistent with peer-reviewed literature.  *Compare* Ex. 19 (Henson 2006) at 1248 (noting daily calibration without further validation or calibration data) *with* Ex. 3 (Matzger Cipla Rep.) ¶ 174; Ex. 6 (Matzger Hikma Rep.) ¶ 213.  And any dispute about Dr. Matzger's inclusion of validation protocols goes to the weight, not admissibility, of his testimony.  *See United States v. Rouse*, 2024 WL 2044630, at *1 (4th Cir. May 8, 2024).

At bottom, Defendants' insistence on the use of reference standards and additional validation rests on a single quotation from the report of Hikma's own expert, Dr. Steed.  Br. at 19.  Reliance on the opinion of Hikma's expert, who admittedly is not an expert in Raman mapping, *see* Ex. 4 (Steed Tr.) at 162:18–163:3 ("I don't recall using Raman mapping in my research because it's not the kind of research that I do."), is an insufficient basis to exclude Dr. Matzger's testimony, *see Shire Viropharma Inc. v. CSL Behring LLC*, 2021 WL 1227097, at *8 (D. Del. March 31, 2021) ("Under *Daubert*, a court may not evaluate the credibility of opposing experts or the persuasiveness of their conclusions." (citations omitted)).  Adjudication of comparative opinions "is best rendered based on examination and cross-examination, not *Daubert* Briefs."  *In re Novartis*, 2024 WL 4723274, at *3.

V.    **CONCLUSION**

Plaintiffs respectfully request that the Court deny Defendants' *Daubert* motion.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Megan E. Dellinger*

OF COUNSEL:

Thomas H.L. Selby
Stanley E. Fisher
Christopher J. Mandernach
Andrew L. Hoffman
Ayelet Evrony
Rhochelle Krawetz
Daniel P. Schneider
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC  20024
(202) 434-5000

January 29, 2026

Jeremy A. Tigan (#5239)
Megan E. Dellinger (#5739)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jtigan@morrisnichols.com
mdellinger@morrisnichols.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on January 29, 2026, upon the following in the manner indicated:

Neal C. Belgam, Esquire                                          *VIA ELECTRONIC MAIL*
Daniel A. Taylor, Esquire
SMITH, KATZENSTEIN & JENKINS, LLP
1000 West Street, Suite 1501
Wilmington, DE  19801
*Attorneys for Defendant Cipla Limited*

Joshua I. Miller, Esquire                                        *VIA ELECTRONIC MAIL*
Amlan Ray, Esquire
Frank Rodriguez, Esquire
WINDELS MARX LANE & MITTENDORF, LLP
One Giralda Farms
Madison, NJ  07940
*Attorneys for Defendant Cipla Limited*

Dominick T. Gattuso, Esquire                                     *VIA ELECTRONIC MAIL*
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE  19801
*Attorneys for Defendant Hikma*
*Pharmaceuticals USA Inc.*

Jeffrey S. Ward, Esquire                                         *VIA ELECTRONIC MAIL*
Emer L. Simic, Esquire
Charles K. Shih, Esquire
Joseph Sherling, Esquire
Laura E. Breckenridge, Esquire
NEAL GERBER & EISENBERG LLP
225 West Randolph Street, Suite 2800
Chicago, IL  60606
*Attorneys for Defendant Hikma*
*Pharmaceuticals USA Inc.*

*/s/ Megan E. Dellinger*
_____
Megan E. Dellinger (#5739)